## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STEVEN BROWN, *et al.*,

    Plaintiffs,

      v.

                              CIVIL ACTION NO. RDB-16-945

DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONAL
SERVICES, *et al.*,

    Defendants.

        *      *      *      *      *      *      *      *      *      *      *

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Stephen Z. Meehan (Federal Bar No. 23915)
Damien Dorsey (Federal Bar No. 19194)
Prisoner Rights Information System of MD, Inc.
P.O. Box 929
Chestertown, Maryland 21620
Telephone: 410-528-1400
Telecopier: 410-528-1550
smeehan@prisminc.org

Eve L. Hill (Federal Bar No. 19938)
Jessica P. Weber (Federal Bar No. 17893)
Abigail Graber (Federal Bar No. 19727)
James T. Fetter (Federal Bar No. 20727)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
(410) 962-1030 (phone)
(410) 385-0869 (fax)
ehill@browngold.com
agraber@browngold.com
jweber@browngold.com
jfetter@browngold.com

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

PLAINTIFFS' ALLEGATIONS ...................................................................................... 1

STANDARD OF REVIEW ............................................................................................ 2

ARGUMENT ................................................................................................................ 3

I.       Defendants' Motion Should Be Rejected as Untimely and Improper. ............................... 3

II.      Plaintiffs Have Stated Plausible Claims Under Section 1983. ................................ 4

         A.       Plaintiffs Have Sufficiently Alleged Defendants' Knowledge and
                  Responsibility for Constitutional Violations. ................................................ 4

                  1.       Plaintiffs Challenge Defendants' Official Policies. .................................. 5

                  2.       Plaintiffs Sufficiently Allege Challenges to Defendants' Practices
                           and Customs. ................................................................................ 7

         B.       Plaintiffs Have Sufficiently Alleged Denial of Access to the Courts. ................... 9

         C.       Plaintiffs Have Sufficiently Alleged Deliberate Indifference. ............................. 12

         D.       The Individual Defendants Are Not Entitled to Qualified Immunity. ................... 14

                  1.       The Right to Access the Courts Was Clearly Established. ....................... 15

                  2.       The Prohibition of Cruel and Unusual Punishment Was Clearly
                           Established. .................................................................................. 16

III.     Sovereign Immunity Does Not Bar Plaintiffs' ADA Claims Because DPSCS Has
         Waived Its Sovereign Immunity and Congress Has Also Validly Abrogated It. ............. 16

         A.       Eleventh Amendment Immunity Does Not Apply to Claims for Prospective
                  Relief under Title II. ..................................................................................... 17

         B.       To Avoid an Unnecessary Ruling, This Court Should Wait to Address the
                  Sovereign Immunity Issue Until it Resolves the Section 504 Claims. ................. 17

         C.       Defendants' Waiver of Sovereign Immunity under Section 504 Also
                  Precludes the Defense for Title II. ............................................................... 18

         D.       Defendants Have Waived Their Sovereign Immunity Defense by
                  Participating in the Present Lawsuit for over Two Years and by Waiving
                  Their Immunity under Title II in a Previous Case. ............................................ 19

         E.       Congress Validly Abrogated Public Entities' Sovereign Immunity in the
                  Class of Cases Involving Detention in Prisons and Other Detention Facilities.... 20

                  1.       Title II Is an Appropriate Response to the Long History of
                           Constitutional Violations People with Disabilities Have Suffered in
                           Detention Settings. ......................................................................... 22

                  2.       Because Sovereign Immunity Is Abrogated in the Class of Prison
                           Cases, the Court Need Not Determine Whether Each Title II Claim
                           Constitutes a Constitutional Violation. .............................................. 24

IV.      Plaintiffs Have Adequately Pled ADA and Section 504 Claims. .................................... 26

A.  Intent Is Not Required for Injunctive Relief under Title II and Section 504. ....... 27

B.  Plaintiffs Alleged They Are Denied Effective Access to Orientation Materials. . 29

C.  Plaintiffs Adequately Pled Denial of Access to the Courts and Law Library. ..... 31

D.  Plaintiffs Adequately Pled Denial of Access to the Mail. .................................... 32

E.  Plaintiffs Adequately Pled Denial of Access to Work and Educational
    Programs…. ......................................................................................................... 33

F.  Plaintiffs Adequately Pled That Defendants Prevented Them from
    Independently Navigating and Accessing RCI's Facilities and Services. ............ 33

G.  Plaintiffs Adequately Pled That Segregating Them at RCI and Double-Celling
    Them Without Regard to Safety Violated the ADA and Section 504. ................. 34

CONCLUSION ................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Rice,*
  40 F.3d 72 (4th Cir. 1994) .................................................. 10

*Alexander v. Cty. of Los Angeles,*
  64 F.3d 1315 (9th Cir. 1995) ................................................ 15

*Amos v. Maryland Department of Public Safety and Correctional Services,*
  178 F.3d 212 (4th Cir. 1998) ............................................... 22

*Antonelli v. Sheahan,*
  81 F.3d 1422 (7th Cir. 1996) ............................................ 10-11

*Armstrong v. Brown,*
  732 F.3d 955 (9th Cir. 2013) ............................................... 29

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).................................................... 2, 12

*Atascadero State Hosp. v. Scanlon,*
  473 U.S. 234 (1985)........................................................ 19

*Baird* ex rel. *Baird v. Rose,*
  192 F.3d 462 (4th Cir. 1999) ............................................... 27

*Bartlett v. New York State Bd. of Law Examiners,*
  970 F. Supp. 1094 (S.D.N.Y. 1997)........................................ 28

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)......................................................... 2

*Booker v. South Carolina Dep't of Corr.,*
  855 F.3d 533 (4th Cir. 2017) ............................................... 11

*Bounds v. Smith,*
  430 U.S. 817 (1977).................................................... 9, 15

*Cable v. Dep't of Developmental Servs. of California,*
  54 F. App'x 263 (9th Cir. 2002) ........................................... 19

*Chase v. O'Malley,*
  466 F. App'x 185 (4th Cir. 2012) .......................................... 32

*City of Bourne v. Flores,*
  521 U.S. 507 (1997)................................................ 21, 25, 26

*Clark v. Barnard,*
  108 U.S. 436 (1883)........................................................ 19

*Clarkson v. Coughlin,*
  898 F. Supp. 1019 (S.D.N.Y. 1995)........................................ 29

*Constantine v. Rectors & Visitors of George Mason Univ.,*
  411 F.3d 474 (4th Cir. 2005) ......................................... passim

*Cooper v. Kliebert,*
  No. 14-507-SDDSCR, 2014 WL 7334911 (M.D. La. Dec. 19, 2014) ................................... 18

*DeMallory v. Cullen,*
  855 F.2d 442 (7th Cir. 1988) .................................................................................................. 11

*Edwards v. City of Goldsboro,*
  178 F.3d 231 (4th Cir. 1999) .................................................................................................... 2

*Estate of Robert Ethan Saylor v. Regal Cinemas, Inc.,*
  No. WMN-13-3089, 2016 WL 4721254 (D. Md. Sept. 9, 2016) ........................................... 15

*Estate of Saylor v. Rochford,*
  698 F. App'x 72 (4th Cir. 2017) ............................................................................................. 15

*Estelle v. Gamble,*
  429 U.S. 97 (1976) .................................................................................................................. 23

*Ex parte Hull,*
  312 U.S. 546 (1941) .......................................................................................................... 15, 22

*Ex parte Young,*
  209 U.S. 123 (1908) ................................................................................................................ 17

*Farmer v. Brennan,*
  511 U.S. 825 (1994) ................................................................................................ 13, 14, 16, 23

*Frame v. City of Arlington,*
  657 F.3d 215 (5th Cir. 2011) .................................................................................................. 27

*Gagnon v. Scarpelli,*
  411 U.S. 778 (1973) ................................................................................................................ 23

*Gardner v. New Jersey,*
  329 U.S. 565 (1947) ................................................................................................................ 19

*Garrity v. Sununu,*
  752 F.2d 727 (1st Cir. 1984) ................................................................................................... 20

*Gaylor v. Georgia Dep't of Nat. Res.,*
  No. 2:11-CV-288-RWS, 2013 WL 4790158 (N.D. Ga. Sept. 6, 2013) ................................. 18

*Gomez v. Toledo,*
  446 U.S. 635 (1980) .................................................................................................................. 4

*Graham v. Connor,*
  490 U.S. 386 (1989) ................................................................................................................ 15

*Greater Los Angeles Council on Deafness, Inc. v. Zolin,*
  812 F.2d 1103 (9th Cir. 1987) ................................................................................................ 28

*Greenholtz v. Inmates of Neb. Penal & Corr. Complex,*
  442 U.S. 1 (1979) .................................................................................................................... 23

*Guardians Ass'n v. Civil Serv. Comm'n,*
  463 U.S. 582 (1983) ................................................................................................................ 27

*Gunter v. Atlantic Coast Line R.R. Co.*,
    200 U.S. 273 (1906).................................................................................. 19

*Hall v. DIRECTV, LLC*,
    846 F.3d 757 (4th Cir. 2017) .................................................................... 3

*Hankins v. Finnel*,
    964 F.2d 853 (8th Cir. 1992) ................................................................... 19

*Harris v. Young*,
    718 F.2d 620 (4th Cir. 1983) ................................................................... 11

*Havens v. Colorado Department of Corrections*,
    897 F.3d 1250 (10th Cir. 2018) ............................................................... 31

*Helling v. McKinney*,
    509 U.S. 25 (1993).................................................................................. 13

*Henderson v. Thomas*,
    913 F. Supp. 2d 1267 (M.D. Ala. 2012) ................................................ 34

*Hill v. Blind Indus. & Servs. of Maryland*,
    179 F.3d 754 (9th Cir.) ........................................................................... 20

*Hope v. Pelzer*,
    536 U.S. 730 (2002)................................................................................ 23

*Hudson v. McMillian*,
    503 U.S. 1 (1992).................................................................................... 23

*Hudson v. Palmer*,
    468 U.S. 517 (1984)................................................................................ 23

*In re Corporacion de Servicios Medico Hospitalarios de Fajardo*,
    123 B.R. 4 (Bankr. D.P.R. 1991) ............................................................ 20

*Jacobs v. City of Chicago*,
    215 F.3d 758 (7th Cir. 2000) ................................................................... 15

*Jarboe v. Maryland Dep't of Pub. Safety & Corr. Servs.*,
    No. CIV.A. ELH-12-572, 2013 WL 1010357 (D. Md. Mar. 13, 2013) ................. 20

*Johnson v. Avery*,
    393 U.S. 483 (1969)................................................................................ 22

*Johnson v. Neiman*,
    504 F. App'x 543 (8th Cir. 2013) ............................................................ 23

*Jones v. Bishop*,
    No. CV CCB-16-2893, 2018 WL 1521874 (D. Md. Mar. 28, 2018) ....................... 33

*Jones v. Koons Automotive, Inc.*,
    752 F. Supp. 2d 670 (D. Md. 2010) ..................................................... 2, 14

*Kimel v. Florida Bd. of Regents*,
    528 U.S. 62 (2000).................................................................................. 20

v

*Kwai Fun Wong v. United States*,
   373 F.3d 952 (9th Cir. 2004) ................................................................. 15

*Lapides v. Board of Regents of Univ. Sys. of Ga.*,
   535 U.S. 613 (2002) ................................................................................ 19

*Levy v. Mote*,
   104 F. Supp. 2d 538 (D. Md. 2000) ....................................................... 30

*Love v. Westville Corr. Ctr.*,
   103 F.3d 558 (7th Cir. 1996) ................................................................. 28

*Makdessi v. Fields*,
   789 F.3d 126 (4th Cir. 2015) ................................................................. 13

*Mann v. Adams*,
   855 F.2d 639 (9th Cir. 1988) ................................................................. 10

*Mason v. Correctional Medical Services*, *Inc.*,
   559 F.3d 880 (8th Cir. 2009) ................................................................. 32

*McCoy v. Tex. Dep't of Crim. Justice*,
   No. C-05-370, 2006 WL 2331055 (S.D. Tex. Aug. 9, 2006) ................. 31

*McKenna v. Wright*,
   386 F.3d 432 (2d Cir. 2004) ................................................................... 15

*Monell v. Dept. of Social Servs. of City of New York*,
   436 U.S. 658 (1978) ......................................................................... 4, 5, 7

*Nat'l Fed'n of the Blind v. Lamone*,
   813 F.3d 494 (4th Cir. 2016) ................................................................. 26

*Neinast v. Texas*,
   217 F.3d 275 (5th Cir. 2000) ................................................................. 19

*Nevada Dep't of Human Res. v. Hibbs*,
   538 U.S. 721 (2003) ................................................................................ 21

*Owens v. Baltimore City State's Attorney's Office*,
   767 F.3d 379 (4th Cir. 2014) ............................................................... 5, 7

*Pace v. Bogalusa City Sch. Bd.*,
   403 F.3d 272 (5th Cir. 2005) ................................................................. 18

*Pandazides v. Virginia Bd. of Educ.*,
   13 F.3d 823 (4th Cir. 1994) ................................................................... 27

*Parrish* ex rel. *Lee v. Cleveland*,
   372 F.3d 294 (4th Cir. 2004) ................................................................. 12

*Paulone v. City of Frederick*,
   787 F. Supp. 2d 360 (D. Md. 2011) ................................................. 27, 28

*Paxman v. Campbell*,
   612 F.2d 848 (4th Cir. 1980) ................................................................... 5

*Pearson v. Callahan,*
   555 U.S. 223 (2009) ........................................................................ 14

*Pell v. Procunier,*
   417 U.S. 817 (1974)......................................................................... 23

*Pevia v. Commr. of Correction,*
   No. ELH-17-0273, 2018 WL 4052244 (D. Md. Aug. 24, 2018) ............................ 10

*Pierce v. Cty. of Orange,*
   526 F.3d 1190 (9th Cir. 2008) ........................................................ 29, 34

*Presley v. City of Charlottesville,*
   464 F.3d 480 (4th Cir. 2006) ............................................................. 2

*Proctor v. Prince George's Hospital Center,*
   32 F. Supp. 2d 820 (D. Md. 1998) ...................................................... 28

*Rhodes v. Chapman,*
   452 U.S. 337 (1981) ................................................................. 16, 26

*Rosen v. Montgomery County,*
   121 F.3d 154 (4th Cir.1997) ............................................................ 27

*Saucier v. Katz,*
   533 U.S. 194 (2001) .................................................................... 14

*Savko v. Rollins,*
   749 F. Supp. 1403 (D. Md. 1990) ....................................................... 10

*Scinto v. Stansberry,*
   841 F.3d 219 (4th Cir. 2016) ........................................................... 12

*Seremeth v. Bd. of Cty. Comm'rs,*
   673 F.3d 333 (4th Cir. 2012) ....................................................... 18, 26

*Shaw v. Stroud,*
   13 F.3d 791 (4th Cir. 1994) ............................................................. 9

*Smith v. Ray,*
   781 F.3d 95 (4th Cir. 2015) ............................................................ 14

*Spell v. McDaniel,*
   824 F.2d 1380 (4th Cir. 1987) ..................................................... 6, 7, 8

*Strickler v. Waters,*
   989 F.2d 1375 (4th Cir. 1993) ......................................................... 11

*Tennessee v. Lane,*
   541 U.S. 509 (2004).............................................................. passim

*Turner v. Safley,*
   482 U.S. 78 (1987) .................................................................... 22

*United States v. Georgia,*
   546 U.S. 151 (2006) ................................................................... 22

*Verizon Md., Inc. v. Public Serv. Comm'n,*
    535 U.S. 635 (2002) ..................................................................... 17

*Vitek v. Jones,*
    445 U.S. 480 (1980) ..................................................................... 23

*Washington v. Corr. Med. Servs.,*
    No. 05–3715, 2006 WL 3833466 (D.N.J. Dec. 29, 2006) ...................... 29

*Washington v. Harper,*
    494 U.S. 210 (1990) ............................................................... 23, 30

*Washington v. Indiana High School Athletic Ass'n, Inc.,*
    181 F.3d 840 (7th Cir. 1999) ......................................................... 27

*Wells v. Thaler,*
    460 F. App'x 303 (5th Cir. 2012) ................................................... 32

*Wolff v. McDonnell,*
    418 U.S. 539 (1974) ............................................................... 22, 23

*Wright v. N.Y. State Dep't of Corr.,*
    242 F. Supp. 3d 126 (N.D.N.Y. 2017) ............................................. 29

*Wright v. N.Y. State Dep't of Corr.,*
    831 F.3d 64 (2nd Cir. 2016) ......................................................... 29

*Young v. Harper,*
    520 U.S. 143 (1997) ..................................................................... 23

*Younger v. Gilmore,*
    404 U.S. 15 (1971) ....................................................................... 22

*Zemedagegehu v. Arthur,*
    No. 1:15CV57 JCC/MSN, 2015 WL 1930539 (E.D. Va. Apr. 28, 2015) ......... 24

**Statutes**

42 U.S.C. § 12132 ......................................................................... 24

42 U.S.C. § 12202 ......................................................................... 20

42 U.S.C. § 1983 ............................................................................. 2

42 U.S.C. § 1997 ........................................................................... 11

42 U.S.C. § 2000 ........................................................................... 18

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ............................ 2

Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 ............... 2

**Rules**

Fed. R. Civ. P. 12 ............................................................................. 3

**Regulations**

28 C.F.R. § 35.104 ......................................................................... 30

28 C.F.R. § 35.130 ......................................................................................................... 24

28 C.F.R. § 35.139 ......................................................................................................... 24

28 C.F.R. § 35.151 ......................................................................................................... 24

28 C.F.R. § 35.160 ................................................................................................... 30, 31

28 C.F.R. § 35.164 ......................................................................................................... 24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STEVEN BROWN, *et al.*,

     Plaintiffs,

       v.

                            CIVIL ACTION NO. RDB-16-945

DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONAL
SERVICES, *et al.*,

     Defendants.

        *    *    *    *    *    *    *    *    *    *    *

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

     Plaintiffs, by and through their undersigned counsel, oppose Defendants' Motion to

Dismiss Plaintiffs' First Amended Complaint.  Because Defendants' motion is untimely,

Plaintiffs have sufficiently alleged their claims, and sovereign immunity is no bar here, the Court

should deny Defendants' motion and allow the case to proceed.

**PLAINTIFFS' ALLEGATIONS**

     Plaintiffs are nine current and former inmates at the Roxbury Correctional Institution

("RCI")[1] who are blind.  Am. Compl. ¶¶ 1, 13-21, ECF No. 23.  Because Defendants'

discriminatory policies and practices have left them reliant on sighted inmates to read and write,

access the courts, and navigate their environments, have excluded them from jobs and

educational opportunities—some of which would reduce the length of their incarceration—and

have led to their placement in either overly restrictive or unsafe housing arrangements, Plaintiffs

have brought suit against the Department of Public Safety and Correctional Services ("DPSCS"),

DPSCS Secretary Stephen Moyer, Division of Correction Commissioner Dayena Corcoran, and

former RCI Warden Richard Miller (collectively, "Defendants").  In their Amended Complaint,

---

[1] Plaintiff Robert Wilson is currently housed at the Eastern Correctional Institution.

Plaintiffs bring four claims: (1) Section 1983, 42 U.S.C. § 1983, claim against Defendants Moyer, Corcoran, and Miller ("the individual Defendants") in their personal and official capacities for denial of access to the courts, in violation of the Fourteenth Amendment, *id.* ¶¶ 86-90; (2) Section 1983 claim against the individual Defendants in their personal and official capacities for violation of the Eighth Amendment's prohibition of cruel and unusual punishments, *id.* ¶¶ 91-96; (3) Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12165, 12202-12213, claim for discriminatory treatment on the basis of disability against Defendants DPSCS and, in his official capacity, Defendant Moyer, *id.* ¶¶ 97-116; and (4) Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, claim for discriminatory treatment on the basis of disability against Defendants DPSCS and, in his official capacity, Defendant Moyer, *id.* ¶¶ 117-136.  Because of Defendants' discriminatory practices, Plaintiffs have suffered extortion, sexual abuse, and violence, and been placed at greater risk of such conduct, have lost money and the opportunity to earn higher wages and credits off their sentences and to benefit from educational opportunities, have been exposed to greater risk of discipline, and have lost or been unable to initiate or continue court proceedings and the grievance procedure.  *Id.* ¶¶ 30, 38, 39-42, 49, 51, 56, 62-63, 69-70, 74-75, 79-81.

## STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the plaintiff's complaint.  *Jones v. Koons Auto., Inc.*, 752 F. Supp. 2d 670, 681 (D. Md. 2010) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  However, it does "not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).  In deciding a motion to dismiss, the only question for the court is whether the plaintiff has stated a claim for relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing whether a plaintiff has alleged a claim that is plausible on

2

its face, the court must accept as true all the well-pleaded allegations in the complaint and construe the facts and reasonable inferences that can be drawn therefrom in the light most favorable to the plaintiff. *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017).

## ARGUMENT

### I.    Defendants' Motion Should Be Rejected as Untimely and Improper.

Defendants have missed their opportunity to file a motion to dismiss for failure to state a claim.  Defenses of failure to state a claim under Rule 12(b)(6) may be made either in a responsive pleading or by motion, but the "motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed."  Fed. R. Civ. P. 12(b).  As discussed below, a pleading responsive to Plaintiffs' Amended Complaint was due within 10 days of establishment of a settlement schedule.  Having failed to timely file such a pleading, Defendants' motion to dismiss is untimely and improper and should not be considered.[2]

Plaintiffs filed their Amended Complaint on September 6, 2016.  ECF No. 20.  Two years and four months later, in the midst of a tight discovery schedule that ends on March 1, 2019, with trial set for April 22, Defendants filed their motion to dismiss on January 10, 2019.  Defendants offer no reason for their delay in filing the instant motion.

After numerous extensions to Defendants' deadline to respond to the complaint, the Court, on December 18, 2017, ordered Defendants to respond "ten (10) days after referral of this matter to a Magistrate Judge . . .  and either (a) *development of a schedule* or (b) *joint declaration of an impasse in developing a schedule* after reasonable attempts to do so." Order, ECF No. 51 (emphasis added). Magistrate Judge Gallagher set a schedule for settlement negotiations on February 27, 2018, ECF No. 55, but Defendants did not file a responsive pleading within 10

---

[2] In the alternative, the motion should be treated as a motion for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), without leave to file a later answer if the motion is denied.  *See* Fed. R. Civ. P. 12(h)(2) ("Failure to state a claim upon which relief can be granted . . . may be raised: (A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial.").  Given Defendants' delay in filing the present motion, Plaintiffs would be prejudiced if Defendants are permitted to file a late answer asserting defenses other than subject matter jurisdiction, for which further discovery would be required.

days.  During settlement conferences with Judge Gallagher in April 2018, the parties set an additional schedule for negotiations, but Defendants again did not file a responsive pleading within 10 days of the establishment of this additional schedule. Even after Plaintiffs declared an impasse in negotiations and the Court issued a scheduling order on September 12, 2018, setting trial for March 11, 2019, Defendants still did not file a responsive pleading.[3]  *See* ECF No. 65.

Defendants only now file their motion to dismiss, erroneously claiming that the 10-day time period for their responsive pleading did not begin until January 3, 2019, when Defendants unilaterally withdrew from settlement negotiations.[4]  *See* ECF No. 109 ¶¶ 2-3.  Defendants have been well aware of the deadlines and needs of this case: they have fully availed themselves of the discovery process (serving a total of 720 interrogatories and 315 requests for production of documents to date) and have sought and received extensions of the trial and discovery deadlines. ECF No. 86.  Defendants offer no reason for their delay in filing the instant motion.

## II.  Plaintiffs Have Stated Plausible Claims Under Section 1983.

### A.  Plaintiffs Have Sufficiently Alleged Defendants' Knowledge and Responsibility for Constitutional Violations.

To plead a § 1983 claim, plaintiffs need only allege that the defendant, while acting under color of state law, deprived the plaintiff of a federal constitutional or statutory right.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).  Defendants, relying on *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), contend that Plaintiffs must allege that each defendant had personal involvement in the alleged violations or knowledge of and an inadequate response to a subordinate's violation.  Defendants misunderstand the pleading requirements and

---

[3] Defendants proposed that the deadline for their responsive pleading or motion be triggered by either the development of a schedule or an impasse "in developing a schedule" for settlement negotiations, ECF No. 49 ¶¶ 3-4.  Having successfully set a schedule for settlement negotiations, an impasse in settlement negotiations themselves (as opposed to the *schedule* for such negotiations) had no bearing on Defendants' timeline for responding.  Plaintiffs note this September 2018 impasse simply to show that Defendants, themselves, did not consider a party's declaration of impasse to trigger the deadline for responsive pleading.

[4] Notably, Defendants have never informed Plaintiffs that such settlement negotiations had reached an impasse.  Nor have the parties submitted a joint declaration of impasse.

misread *Monell*.  As the Fourth Circuit has noted, "[a]lthough prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier . . . . The recitation of facts need not be particularly detailed, and the chance of success need not be particularly high." *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 403 (4th Cir. 2014).

### 1.  Plaintiffs Challenge Defendants' Official Policies.

The Court in *Monell* concluded that "a local government may not be sued under § 1983 for an injury inflicted *solely* by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell,* 436 U.S. at 694.[5]  Here, as in *Monell*, "this case unquestionably involves official policy as the moving force of the constitutional violation."  *Id.*

Many of the alleged violations are not merely instances of improper conduct by low level staff members.  They are the result of implementation of Defendants' policies and procedures, including facially discriminatory policies, and Defendants' refusal to reasonably modify their general rules.  These policies are adopted and implemented by the individual Defendants.  Thus, they are directly attributable to the Defendants and are the causal force of the violations.

Plaintiffs have alleged that the individual Defendants, themselves, had authority and responsibility for adopting and implementing the policies that violated Plaintiffs' rights.  Am. Compl. ¶ 23 (Mr. Moyer, as Secretary of DPSCS, is responsible for the administration of DPSCS), ¶ 24 (Ms. Corcoran, as Commissioner of Correction, is responsible for administration of the Division of Correction and for the well-regulated incarceration of inmates and supervision of correctional staff), ¶ 25 (Mr. Miller, as Warden of RCI, is responsible for governance, discipline, and development and implementation of policies at RCI, is the legal custodian of all RCI inmates, and is responsible for their treatment).

---

[5] Although Plaintiffs in this case sue state officials, not the state itself, under § 1983, officials sued in their official capacities are responsible for the consequences of their policies.  *Paxman v. Campbell*, 612 F.2d 848, 857 (4th Cir. 1980) (applying *Monell* to claims against school board members sued in their official capacities).

"While [a defendant's] 'policy' is found most obviously in . . . ordinances, regulations and the like which directly command or authorize constitutional violations, . . . it may also be found in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy." *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987).  When a "'policy or custom' is itself unconstitutional, *i.e.*, when it directly commands or authorizes constitutional violations, . . . the causal connection between policy and violation is manifest and does not require independent proof." *Id.* at 1387.  When a policy is not itself illegal, deficiencies in "training and supervision which are claimed to have resulted in constitutional violations by untrained or mis-trained [staff]" show causation.  *Id.* at 1389.

Examples of Defendants' policies that violate Plaintiffs' rights under the Fourteenth and Eighth Amendments include: (1) Defendants' policy of denying blind inmates white canes and orientation and mobility training to navigate DPSCS facilities while assigning unqualified, unreliable, and unscreened inmate "walkers" to blind inmates rather than providing them reasonable modifications and auxiliary aids to independently navigate, Am. Compl. ¶¶ 7, 61, 63; (2) Defendants' policy of providing grievance forms and responses only in inaccessible print formats, and refusing to assign qualified staff to assist blind inmates, *id.* ¶¶ 4, 32, 33; (3) Defendants' policy of excluding blind inmates from certain work programs because of their blindness, *id.* ¶¶ 5, 49, 50; (4) Defendants' policy of housing blind inmates at RCI even when they have lower security classifications, *id.* ¶¶ 9, 75; and (5) Defendants' policy of housing blind inmates in double cells regardless of the risks to their safety of such housing, *id.* ¶¶ 10, 82-83.

Examples of Defendants' policy of refusing to modify general policies and procedures when necessary to accommodate blind inmates include: (1) Defendants' policy of providing the Inmate Handbook and orientation materials only in inaccessible print formats and declining to provide them in accessible formats or to provide qualified staff to read the information aloud, *id.* ¶¶ 3, 30; (2) Defendants' policy of offering grievance documents, legal research materials, and access to court processes only in inaccessible print formats and declining to provide them in accessible formats or to provide qualified staff to assist blind inmates, *id.* ¶¶ 4, 33, 36, 37; (3)

Defendants' policy of offering educational materials only in inaccessible print formats and declining to provide them in accessible formats or to provide qualified staff to assist blind inmates, *id.* ¶¶ 6, 55, 57; (4) Defendants' policy of refusing to provide or permit blind inmates to possess auxiliary aids to read and write mail or to provide qualified staff to read and write mail for blind inmates, *id.* ¶¶ 8, 68; and (5) Defendants' policies of refusing to provide educational materials in accessible formats, refusing to require education providers to provide accessible educational materials for blind inmates, and refusing to provide or permit auxiliary aids and services or qualified staff to assist blind inmates in educational programs, *id.* ¶ 55.

### 2. Plaintiffs Sufficiently Allege Challenges to Defendants' Practices and Customs.

Plaintiffs have alleged that the individual Defendants knew of the practices being applied to Plaintiffs, of the law's requirements, and of Plaintiffs' harm, and were responsible for stopping the practices, but failed to take action. Such allegations are sufficient to state a claim under § 1983 on the basis of Defendants' constitutionally violative customs. Far from requiring Defendants to have "personally violated . . . plaintiff's constitutional rights," Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 13, § 1983 holds government officials responsible for their actions in failing to respond appropriately to unconstitutional conduct by their staff.

"Custom, or usage," and not merely, "[o]fficial policy in the relatively narrow sense of discrete, consciously chosen courses of action by policymakers" can form the basis for municipal liability. *Spell*, 824 F.2d at 1386; *see Owens*, 767 F.3d at 402. A "custom or usage" can be found in "persistent and widespread" practices of officials, which "[a]lthough not authorized by written law, [are] so permanent and well-settled as to [have] the force of law." *Spell*, 824 F.2d at 1386 (citing *Monell*). Thus, a defendant may be liable under § 1983 either if it institutes a policy that violates Plaintiffs' federal rights or if it maintains a custom of "condonation" of its employees' violations of federal rights and fails "to put a stop to or correct a widespread pattern of unconstitutional conduct." *Owens*, 767 F.3d at 402 (citations omitted); *accord Spell*, 824 F.2d at 1389 (explaining that municipal liability may attach without an unconstitutional policy where

policymakers fail "to put a stop to or correct a widespread pattern of unconstitutional conduct by [lower-level staff] of which the specific violation is simply an example").

A policy is attributable to a defendant if it is directly made by its authorized officials or "when the duration and frequency of the practices warrants a finding of *either actual or constructive knowledge* by the [defendant] that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387 (emphasis added). A plaintiff can demonstrate constructive knowledge by showing that the "practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the [defendant] should have known of them." *Id.* Here Plaintiffs allege that the individual Defendants had both actual and constructive knowledge of the formal policies and flagrant customs violating Plaintiffs' rights. For each allegation of unconstitutional practices (namely, the allegations regarding lack of access to grievance and legal processes and failure to allow Plaintiffs to navigate their facilities independently, to allow Plaintiffs to read and write independently, and to house blind inmates appropriately), Plaintiffs have alleged that each Defendant had authority and responsibility and that each Defendant knew the applicable law. Am. Compl. ¶¶ 23-25. Plaintiffs also allege that they informed the individual Defendants of the violations. *Id.* ¶ 46 (Plaintiffs protested lack of access to grievance and legal processes to Defendants, including specifically Defendant Miller), ¶ 65 (inability to navigate RCI facilities and the risks posed by "walkers"), ¶ 71 (inaccessibility of mail services), ¶ 76 (segregation at RCI), ¶ 84 (double-celling). Plaintiffs further allege that Defendants had actual knowledge of the widespread practice of constitutional violations due to a 2012 Administrative Law Judge decision in response to a grievance filed by one of the Plaintiffs. *Id.* ¶¶ 46, 58. That decision held that the Division of Correction had unlawfully failed to allow blind inmates access to library services and to participate fully in educational classes. *Id.* However, Defendants did not act to comply with this order. *See, e.g.*, *id.* ¶¶ 34-36, 54-57.

At a minimum, the individual Defendants certainly had notice of the violative policies and practices by March 2016, when Plaintiffs filed their pro se complaint challenging their lack of access to the courts and grievance procedures, Compl. ¶¶ B, C; ¶¶ 1, 2, 3, ECF No. 1, their

lack of access to written materials on inmate rights and the Inmate Handbook, *id.* ¶¶ 5, 8, their double-celling, *id*. ¶ 6, and their lack of access to mail and legal mail, *id.* ¶ 7.  Defendants were again informed of the violations in September 2016, when Plaintiffs filed their Amended Complaint.  Yet, as the continued litigation demonstrates, these policies and practices continue to exist today.  Defendants therefore had actual knowledge of constitutional violations in March 2016 and again in September 2016, but have failed to stop the practices.

Defendants' reliance on *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), is misplaced.  *Shaw* was decided on summary judgment, not a motion to dismiss.  *Id.* at 797-798.  The appeal addressed whether the *evidence* sufficiently supported the allegation of deliberate indifference. *Id.* at 799-801.  By contrast, a motion to dismiss must be based on the allegations, not the undeveloped evidence.  As the *Shaw* court noted, "[the supervisory liability] issue is ordinarily one of fact, not law."  *Id.* at 799. Accordingly, Plaintiffs have sufficiently alleged that Defendants' unlawful policies and practices are imputable to the individual Defendants.

**B.  Plaintiffs Have Sufficiently Alleged Denial of Access to the Courts.**

Plaintiffs' allegations that Defendants denied them access to the courts by failing to provide them with private, independent, and reliable means of accessing legal materials, legal assistance, court proceedings, and the grievance procedure constitute a violation of the Fourteenth Amendment.  In arguing otherwise, Defendants rely on inapposite case law and fail to consider the actual nature of Plaintiffs' claims.  Defendants, citing *Bounds v. Smith*, 430 U.S. 817, 825 (1977), state that prison authorities are only required to provide "adequate law libraries or adequate assistance from persons trained in the law."  Defendants fail to recognize, however, that although these resources may be available to sighted inmates, they remain out of reach to Plaintiffs, who are unable to access them. Defendants ignore Plaintiffs' allegations that they are forced to rely on sighted inmates to access legal materials and to read and write mail (including to attorneys), Am. Compl. ¶¶ 32-38, 68-69, that such forced reliance comes at a cost financially and to Plaintiffs' safety, *id.* ¶¶ 39-40, 69-70, that Plaintiffs cannot always access sighted assistance, let alone ensure its accuracy, *id.* ¶¶ 41-42, and that they and their sighted helpers have

endured retaliation when trying to provide Plaintiffs access to the courts, *id.* ¶¶ 43-44.  Thus, Plaintiffs have adequately alleged that they lack any independent, reliable, and private means of accessing the basic and required resources of a law library or individuals trained in the law.

Defendants' reliance on *Savko v. Rollins*, 749 F. Supp. 1403 (D. Md. 1990) and *Pevia v. Commissioner of Correction*, No. ELH-17-0273, 2018 WL 4052244 (D. Md. Aug. 24, 2018), for the proposition that inmates are generally provided legal services by external entities such as the Office of the Public Defender, the Prisoner Rights Information System of Maryland ("PRISM"), and the Library Assistance to State Inmates ("LASI"), and that these resources have previously been deemed constitutionally adequate, is further misplaced.  *Savko* concerned the constitutionality of regulations limiting the amount of personal property, including legal research materials, that inmates could keep in their cells.  749 F. Supp. at 1404.  In upholding the property limitations, the court held that the inconvenience to inmates was not unconstitutional when external legal services were available.  *Id.* at 1408. In *Pevia*, a sighted inmate sought a preliminary injunction and temporary restraining order, arguing that he was denied access to legal materials due to library and computer restrictions placed on him because of his security level.  2018 WL 4052244, at *1-3.  In denying injunctive relief, the Court found no irreparable harm because the plaintiff had access to a legal computer and LASI.  *Id.* at *12.

In the present case, however, Plaintiffs have no method for independently accessing legal resources.  This case is not merely about keeping additional law books in one's cell or having less (but some) access to the law library; it is about being entirely reliant on inconsistently available and costly sighted assistance to access *all* legal materials.  Furthermore, this Court decided *Savko* and *Pevia* on summary judgment, not motions to dismiss.  A determination that Plaintiffs' access to the courts is constitutionally adequate requires a factual basis, not merely an unsupported assertion that the general legal resources available to sighted inmates are sufficient for blind inmates with different access needs.

Defendants further cite a line of cases including *Mann v. Adams*, 855 F.2d 639 (9th Cir. 1988), *Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994), *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir.

1996), and *Booker v. South Carolina Department of Corrections*, 855 F.3d 533 (4th Cir. 2017),
for the proposition that Plaintiffs' lack of access to the administrative grievance system is lawful
because inmates have no fundamental right to an inmate grievance process. Yet Plaintiffs have
not alleged that the general inmate grievance process is inadequate or that they are entitled to
additional process beyond what is offered to sighted inmates.  Rather, Plaintiffs contend the
grievance process is not accessible to blind inmates and thus is off limits to them absent sighted
assistance, which Defendants refuse to provide and for which Plaintiffs must pay or endure
exploitation and violence to obtain. Am. Compl. ¶¶ 33, 39-41.

   Under the Prison Litigation Reform Act ("PLRA"), which makes the administrative
grievance process a prerequisite for pursuing civil claims in court, Plaintiffs' exclusion from the
grievance process amounts to a denial of access to the courts for civil claims.  *See* 42 U.S.C. §
1997e(a).  Defendants cite no case holding that it is constitutional for a prison to restrict certain
inmates' access to an existing grievance system, thus limiting their ability to file civil lawsuits.
Defendants' contention that Plaintiffs have not alleged actual injury is similarly off the mark.
The Fourth Circuit has stated that "injury may be presumed where a total denial of access to a
law library or legal assistance is alleged." *Strickler v. Waters*, 989 F.2d 1375, 1385 n.16 (4th Cir.
1993) (listing cases); *see DeMallory v. Cullen*, 855 F.2d 442, 449 (7th Cir. 1988) ("In essence,
when an inmate complains of prison rules that substantially and continuously limit his or her
access to legal materials and counseling, the complaint carries an inherent allegation of
prejudice."); *Harris v. Young*, 718 F.2d 620, 622 (4th Cir. 1983) ("Because an inmate is unable
to discover his rights when library access or other access to the law is denied him, any complaint
rightly alleging a present denial of access to a library or other assistance states a valid claim for
equitable relief.").  Because Defendants have totally denied Plaintiffs access to the law library by
failing to provide materials in accessible formats and have severely restricted their ability to
obtain legal assistance by retaliating against sighted inmates who have assisted them and denying
Plaintiffs a private and independent means of communicating with attorneys or other legal
experts outside the prison by mail, this is a case where actual injury can be presumed. Further,

11

Plaintiffs allege that they have had lawsuits dismissed and have been unable to initiate or continue litigation because of Defendants' denial of access to the courts.  Am. Compl. ¶¶ 41-42; *see id.* ¶¶ 4, 36, 37, 40, 43, 44, 45, 88 (alleging other harm from denial of access to courts).

**C.  Plaintiffs Have Sufficiently Alleged Deliberate Indifference.**

Plaintiffs have sufficiently alleged that Defendants acted with deliberate indifference to their Fourteenth and Eighth Amendment rights, both by deliberately designing inaccessible systems that force Plaintiffs to depend on sighted inmates for reading, writing, and traveling and by assigning inmates to help Plaintiffs with no screening process to prevent inmates with a history of violence and abuse from harming Plaintiffs.  Defendants attempt to create a special pleading standard for Eighth and Fourteenth Amendment claims akin to that for fraud under Federal Rule of Civil Procedure 9(b).  Defendants cite no precedent for such a standard because no such precedent exists or has ever existed at least since the end of the "hypertechnical, code-pleading regime." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Defendants also torture the holdings of *Iqbal* and *Twombly* beyond recognition. *Iqbal* does not, as Defendants claim, require plaintiffs to allege specific facts supporting every element of their claims.

Defendants misrepresent the standard for alleging an Eighth Amendment violation. To make a *prima facie* case of deliberate indifference at the pleadings stage, Plaintiffs must allege, not "prove," "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it." *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (quoting *Parrish* ex rel. *Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)).

Defendants also misconstrue *Farmer v. Brennan*, 511 U.S. 825 (1994), to require Plaintiffs to plead that specific sighted inmates harmed them on specific dates and times.  Defs.' Mem. at 10-11.  In fact, Plaintiffs are not required to allege that sighted inmates, in whose custody Defendants placed them, actually harmed them, let alone describe each incident in detail; "[o]ne does not have to await the consummation of threatened injury to obtain preventive

relief." *Farmer*, 511 U.S. at 845.  Instead, it is sufficient for Plaintiffs to allege a "substantial risk of serious injury," not that they have suffered an actual assault.  *Id.* "Consistently with this principle, a subjective approach to deliberate indifference does not require a prisoner seeking 'a remedy for unsafe conditions [to] await a tragic event [such as an] actua[l] assaul[t] before obtaining relief.'" *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993)).

Instead, at the pleading stage a plaintiff must allege that the prison official had "a sufficiently culpable state of mind." *Id.* at 834 (internal quotations omitted). The requisite state of mind for deliberate indifference is more culpable than that for mere negligence but "less than acts or omissions for the very purpose of causing harm or with knowledge that harm *will* result." *Id.* at 835 (emphasis added). "[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* Thus, to plead deliberate indifference, Plaintiffs need not allege that Defendants knew of every, or even any, assaults against them by other prisoners. They only have to allege facts from which the court can draw the "reasonable inference," *Iqbal*, 556 U.S. at 678, that Defendants either behaved, or established policies, with reckless disregard for Plaintiffs' safety. Plaintiffs have alleged such facts here.  *See, e.g.*, Am. Compl. ¶¶ 7, 8, 10,

Nor must Plaintiffs allege that they gave Defendants advance notice of all dangers they faced.  Though Plaintiffs allege that they notified Defendants of the inhumane conditions to which Defendants subjected them, any alleged failure by Plaintiffs to notify Defendants is not dispositive of their claims. *Farmer*, 511 U.S. at 848. At this stage, Plaintiffs must only allege that Defendants knew of the substantial risk of harm to them and were deliberately indifferent to it.[6]

As discussed above, Plaintiffs' complaint sufficiently alleges that Defendants were aware of their own unlawful policies and practices that put Plaintiffs at substantial risk of harm, but failed to correct them.  *See* Am. Compl. ¶¶ 7, 8, 10, 22-25, 60-72, 77-85, 91-96. Furthermore,

---

[6] Indeed, the Fourth Circuit in *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015), stated "a prison official [cannot] escape liability for deliberate indifference by showing that, while he was aware of an obvious substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by a specific prisoner who eventually committed the assault."

13

"[w]hether a prison official had the requisite knowledge of a substantial risk is a *question of fact* subject to demonstration in the usual ways, including inference from circumstantial evidence, and a *factfinder* may conclude that a prison official knew of a substantial risk from the very fact that a risk was obvious." *Farmer*, 511 U.S. at 842 (emphasis added).

**D.  The Individual Defendants Are Not Entitled to Qualified Immunity.**

Because Plaintiffs sufficiently allege violations of clearly established constitutional rights, Defendants are not entitled to qualified immunity from Plaintiffs' § 1983 claims for constitutional violations.  Analyzing a claim of qualified immunity requires a two-pronged inquiry.  The court must determine whether the plaintiff's facts, *as alleged*, establish a violation of a constitutional right.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "[T]he court must [also] decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct."  *Id*. (citing *Saucier*, 533 U.S. at 201).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [government actor] that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.

In assessing objective reasonableness, "the salient question is whether the state of the law at the time of the events at issue gave the [government actor] fair warning that his alleged treatment of the plaintiff was unconstitutional."  *Jones v. Buchanan*, 325 F.3d 520, 531 (4th Cir. 2003) (internal quotation marks omitted).  "Officials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Id.* (internal quotation marks omitted).  It is not necessary for "the very action in question [to have] previously been held unlawful . . . ; [rather] in the light of pre-existing law the unlawfulness must be apparent."  *Id.* (internal quotation marks omitted).  Thus, "draw[ing] fine distinctions between the facts of the present case" and those of previous decisions establishing the relevant constitutional right would not demonstrate that the unconstitutionality of government actors' conduct was not clearly established.  *Smith v. Ray*, 781 F.3d 95, 104 (4th Cir. 2015).

14

Where, as here, qualified immunity is raised in a motion to dismiss, the court must treat all allegations in the complaint as true for purposes of analyzing the defense. *See McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004). Further, the facts supporting the defense must appear on the face of the complaint. *Id.* at 436. As the Ninth and Seventh Circuits have noted, ruling on qualified immunity at the motion to dismiss stage should be rare. *Kwai Fun Wong v. United States*, 373 F.3d 952, 957 (9th Cir. 2004); *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring in part) (observing that "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal"). Indeed, the propriety of dismissing a claim based on qualified immunity at the pleadings stage is particularly doubtful given that "proper application" of the objective reasonableness test for assessing qualified immunity "requires careful attention to the facts and circumstances of each particular case," and is thus a very fact-specific inquiry. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Alexander v. Cty. of Los Angeles*, 64 F.3d 1315, 1322 (9th Cir. 1995) ("[R]easonableness is normally a jury question."); *Estate of Robert Ethan Saylor v. Regal Cinemas, Inc.*, No. WMN-13-3089, 2016 WL 4721254, at *6 (D. Md. Sept. 9, 2016), *aff'd sub nom. Estate of Saylor v. Rochford*, 698 F. App'x 72 (4th Cir. 2017) ("Objective reasonableness is highly fact-specific.").

### 1.  The Right to Access the Courts Was Clearly Established.

The fundamental right to access the courts under the Fourteenth Amendment has been recognized by the Supreme Court for decades. *See, e.g.*, *Ex parte Hull*, 312 U.S. 546, 549 (1941) ("[T]he state and its officers may not abridge or impair [an incarcerated] petitioner's right to apply to a federal court for a writ of habeas corpus."); *Bounds v. Smith*, 430 U.S. 817, 828 (1977) ("[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.").

The details of ensuring that blind inmates have access to the courts need not have been previously determined by the courts for the individual Defendants to have been on notice that this right must be upheld for all inmates, blind and sighted alike. *See Jones*, 325 F.3d at 531

15

("Officials can still be on notice that their conduct violates established law even in novel factual circumstances."). Here, it was obvious—and was brought to Defendants' attention—that Defendants were violating this fundamental constitutional right when they restricted Plaintiffs' access to the courts by failing to make library materials accessible to them, failing to provide Plaintiffs with an independent means of drafting court filings and completing grievance forms (placing them at great risk by relying on sighted inmates for assistance), and instructing sighted inmates not to assist Plaintiffs with judicial filings. *See* Am. Compl. ¶¶ 32-47, 87.

      **2. The Prohibition of Cruel and Unusual Punishment Was Clearly Established.**

Plaintiffs' right to be free of cruel and unusual punishment was also clearly established during the relevant period. Prison conditions amount to cruel and unusual punishment if they "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). As the Supreme Court explained in 1994, a prison official violates the Eighth Amendment for denying humane conditions of confinement when he knows "that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. In *Farmer*, the Supreme Court clearly stated that corrections officers have "a duty to protect prisoners from violence at the hands of other prisoners," because "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 832, 834. Given this clearly established law, the individual Defendants should have known—and, as outlined earlier, were informed—that they were violating the Eighth Amendment by creating a substantial risk of serious harm to Plaintiffs by making them dependent on other inmates, thus rendering them more vulnerable to attacks and other serious harms. *See* Am. Compl. ¶¶ 28-47, 60-72, 77-85, 91-96.

**III. Sovereign Immunity Does Not Bar Plaintiffs' ADA Claims Because DPSCS Has Waived Its Sovereign Immunity and Congress Has Also Validly Abrogated It.**

Even if Defendants were correct that Eleventh Amendment immunity applied to Plaintiffs' ADA claims, Plaintiffs' claims for injunctive relief would continue, as the Eleventh Amendment does not bar injunctive relief. Further, this Court should find that Eleventh

Amendment immunity does not bar any of Plaintiffs' ADA claims for three distinct reasons: (1) DPSCS's and Mr. Moyer's waiver of sovereign immunity under Section 504 should extend to Plaintiffs' identical Title II claim; (2) DPSCS and Mr. Moyer have waived sovereign immunity through their active participation in this case for the past two years and through DPSCS's waiver in a previous case; and (3) Congress has validly abrogated public entities' sovereign immunity.

### A.  Eleventh Amendment Immunity Does Not Apply to Claims for Prospective Relief under Title II.

Regardless of how this Court rules on sovereign immunity, Plaintiffs' claims for injunctive relief against Defendant Moyer in his official capacity should proceed.  Under *Ex parte Young*, the Eleventh Amendment does not bar federal claims for prospective relief against state officials.  209 U.S. 123, 156 (1908); *see Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 496 (4th Cir. 2005).  If the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," Eleventh Amendment immunity is no obstacle.  *Verizon Md., Inc. v. Public Serv. Comm'n*, 535 U.S. 635, 645 (2002)).

Plaintiffs' amended complaint alleges that Secretary Moyer and his agency's violation of Title II is ongoing and seeks six different types of prospective injunctive relief.  Am. Compl. ¶¶ 108-110, 113-114, p. 31 ¶¶ A-F.  As the Fourth Circuit has made clear, these allegations are sufficient to satisfy *Ex parte Young*.  *Constantine*, 411 F.3d at 496.

### B.  To Avoid an Unnecessary Ruling, This Court Should Wait to Address the Sovereign Immunity Issue Until it Resolves the Section 504 Claims.

This Court should not rule on the Defendants' sovereign immunity defense at this juncture: Plaintiffs seek the same relief under both Section 504 and Title II.  Should Plaintiffs obtain relief on their Section 504 claims, they will not require the same relief under Title II.  Thus, the Court should avoid ruling on whether DPSCS's sovereign immunity has been properly waived or abrogated for purposes of Plaintiffs' Title II claim.  *See Ross*, 211 F. Supp. 3d at 528 (declining to rule on whether Eleventh Amendment barred Title II claim because, given that plaintiff had brought Section 504 claim seeking same relief, "as a practical matter, this case will proceed on the same course regardless of whether [the defendant] may later be found immune

17

from plaintiff's ADA claim"); *Gaylor v. Georgia Dep't of Nat. Res.*, No. 2:11-CV-288-RWS, 2013 WL 4790158, at *3 (N.D. Ga. Sept. 6, 2013) (concluding that given the similarity between plaintiff's Section 504 and Title II claims, "unless and until Defendants present evidence establishing that the programs alleged to violate § 504 have not received federal financial assistance, the Court need not address the issue of abrogation under Title II of the ADA").

### C. Defendants' Waiver of Sovereign Immunity under Section 504 Also Precludes the Defense for Title II.

Defendants do not dispute that DPSCS accepts federal funds and has thus waived its sovereign immunity for claims brought under Section 504. Defs.' Mem. at 17 n.4; *see* 42 U.S.C. § 2000d–7(a)(1); *Constantine*, 411 F.3d at 493. It is also undisputed that Plaintiffs' Title II and Section 504 claims in this case are identical and based on the same conduct. Defs.' Mem. at 17 n.4; *see Seremeth v. Bd. of Cty. Comm'rs.*, 673 F.3d 333, 336 n. 1 (4th Cir. 2012) ("Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same.") (internal quotation marks omitted). Accordingly, because DPSCS waived its sovereign immunity for purposes of Plaintiffs' Section 504 claim, it also waived its immunity for their identical Title II claim. *See, e.g.*, *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 289 (5th Cir. 2005) (holding, in a case involving claims targeting the same conduct and seeking the same relief under both Section 504 and Title II, that "Louisiana is not entitled to assert sovereign immunity under the Eleventh Amendment in this case" because it waived its sovereign immunity under Section 504 by accepting federal funds); *Cooper v. Kliebert*, No. 14-507-SDDSCR, 2014 WL 7334911, at *4 (M.D. La. Dec. 19, 2014) (holding that defendant could not claim sovereign immunity under Title II because it had waived immunity under Section 504 by accepting federal funds and plaintiff's Title II and Section 504 claims involved the same issues).

### D. Defendants Have Waived Their Sovereign Immunity Defense by Participating in the Present Lawsuit for over Two Years and by Waiving Their Immunity under Title II in a Previous Case.

"Like personal jurisdiction, . . . Eleventh Amendment immunity need not be raised by a court *sua sponte* . . . and may be waived by the State altogether." *Constantine*, 411 F.3d at 481. For example, "if a State waives its immunity and consents to suit in federal court, the Eleventh Amendment does not bar the action." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985); *see Clark v. Barnard*, 108 U.S. 436, 447 (1883) (a state's sovereign immunity is "a personal privilege which it may waive at pleasure"). A state's voluntary appearance in federal court, for example, effects a waiver of Eleventh Amendment immunity. *Constantine*, 411 F.3d at 481 (citing *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 624 (2002); *Gardner v. New Jersey*, 329 U.S. 565, 574 (1947); *Gunter v. Atl. Coast Line R.R. Co.*, 200 U.S. 273, 284 (1906); *Clark v. Barnard,* 108 U.S. 436, 447 (1883)).

Defendants have waived sovereign immunity by actively participating in this case for more than two years—including through multiple settlement conferences and now in discovery—without raising the defense and by previously consenting to Congress's abrogation of its sovereign immunity in this very context in a previous case before this Court. Although Plaintiffs filed their amended complaint in September 2016, Defendants waited until just three months before trial was set to begin, in the midst of discovery (in which Defendants have been actively engaged), to assert their sovereign immunity defense. Other courts have deemed such extended participation in litigation and belated assertion of the defense to effect a waiver. *See Cable v. Dep't of Developmental Servs. of California*, 54 F. App'x 263, 264 (9th Cir. 2002) (finding defendant waived sovereign immunity defense where it "actively participated in pre-trial proceedings for more than four years and waited until the eve of trial before asserting its immunity"); *Neinast v. Texas*, 217 F.3d 275, 279 (5th Cir. 2000) (An entity "cannot simultaneously proceed past the motion and answer stage to the merits and hold back an immunity defense."); *Hankins v. Finnel*, 964 F.2d 853, 856-58 (8th Cir. 1992) (holding state waived sovereign immunity by "seek[ing] to take advantage of the suit for its own benefit");

19

*Garrity v. Sununu,* 752 F.2d 727, 738 (1st Cir. 1984) (finding defendants' conduct during litigation "indicates consent to this suit and an acceptance of the federal court's jurisdiction"); *In re Corporacion de Servicios Medico Hospitalarios de Fajardo*, 123 B.R. 4, 7 (Bankr. D.P.R. 1991) (finding waiver of sovereign immunity where state entity had "attended all scheduled conferences and hearings, participated in numerous settlement discussions with the debtor, and conducted and concluded pre-trial discovery" before raising defense).

Furthermore, when Defendant DPSCS was sued as recently as 2013 for violations of Title II of the ADA in its facilities, it failed to assert the sovereign immunity defense. *Jarboe v. Maryland Dep't of Pub. Safety & Corr. Servs.*, No. CIV.A. ELH-12-572, 2013 WL 1010357, at *2 n.7 (D. Md. Mar. 13, 2013). It thus consented to Congress's abrogation of its sovereign immunity in Title II cases involving treatment of inmates with disabilities in prisons. Having agreed that abrogation of sovereign immunity is valid in this context less than six years ago, DPSCS should be foreclosed from taking the opposite position in the present litigation. *See Hill v. Blind Indus. & Servs. of Maryland*, 179 F.3d 754, 758 (9th Cir.), *opinion amended on denial of reh'g*, 201 F.3d 1186 (9th Cir. 1999) ("[A] state may waive its Eleventh Amendment immunity by conduct that is incompatible with an intent to preserve that immunity.").

### E. Congress Validly Abrogated Public Entities' Sovereign Immunity in the Class of Cases Involving Detention in Prisons and Other Detention Facilities.

Congress has expressly abrogated states' sovereign immunity under the ADA. *See* 42 U.S.C. § 12202; *Tennessee v. Lane*, 541 U.S. 509, 518 (2004). This express abrogation is valid if it was accomplished "pursuant to a valid grant of constitutional authority." *Id.* at 517 (citation omitted). It is settled that "Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under Section 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment." *Id.* at 518.

Section Five of the Fourteenth Amendment is an affirmative grant of legislative power, *see Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 81 (2000), that gives Congress the "authority both to remedy and to deter violation of [Fourteenth Amendment] rights . . . by prohibiting a

somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727 (2003) (internal quotation marks omitted).  Section Five "is a broad power indeed," *Lane*, 541 U.S. at 518 (citation omitted), empowering Congress not only to remedy past violations of constitutional rights, but also to enact "prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Hibbs*, 538 U.S. at 727-728.  Thus, Congress may prohibit "practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the Equal Protection Clause."  *Lane*, 541 U.S. at 520.

To determine whether Congress has validly abrogated a state's sovereign immunity pursuant to its Section 5 authority, courts must follow the three-part test in *City of Bourne v. Flores*, 521 U.S. 507 (1997).  This Court should consider: (1) the "constitutional right or rights that Congress sought to enforce when it enacted Title II," *Lane*, 541 U.S. at 522; (2) whether there was a history of unconstitutional disability discrimination to support Congress's determination that "inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation," *id.* at 529; and (3) "whether Title II is an appropriate response to this history and pattern of unequal treatment" as applied to the class of cases implicating conditions of confinement in prisons, jails, and detention centers.[7]  *Id.* at 530.

It is well settled that in passing the ADA, Congress sought to enforce rights under the Equal Protection Clause, as well as an array of rights subject to heightened scrutiny under the Due Process Clause of the Fourteenth Amendment.  *Id.* at 522-523.  The Supreme Court has also held that Congress relied on a sufficient historical predicate of unconstitutional disability discrimination to justify broad prophylactic legislation.  *Id.* at 523-28; *Constantine*, 411 F.3d at

---

[7] In this case, the "class of cases" at issue is the broad class involving conditions of confinement in detention facilities.  *See Lane*, 541 U.S. at 531 (Title II's abrogation is valid for "the class of cases implicating the accessibility of judicial services."); *Constantine*, 411 F.3d at 488 (Title II's abrogation is valid for "the class of cases implicating the right to be free from irrational disability discrimination in public higher education.").  Plaintiffs' claims regarding access to the grievance process and courts may also be defined as part of the class of cases involving access to the courts, an area found to be a valid abrogation of immunity in *Lane*.

485.  The third factor, the appropriateness of Congress's response to this history, or the "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end," *Constantine*, 411 F.3d at 485, is also satisfied, as discussed below.

### 1. Title II Is an Appropriate Response to the Long History of Constitutional Violations People with Disabilities Have Suffered in Detention Settings.

As Defendants are well aware, the Fourth Circuit in *Amos v. Maryland Department of Public Safety and Correctional Services*, 178 F.3d 212, 223 (4th Cir. 1998), *rehearing en banc granted, judgment vacated* (1999), previously held that Title II validly abrogated DPSCS' sovereign immunity in the context of disability rights in prison.  After rehearing *en banc* was granted, DPSCS settled the case, avoiding the *en banc* decision.  However, it remains clear that the ADA constitutes a valid abrogation of sovereign immunity in this context. Given the vast array of constitutional rights at stake in prisons and other detention settings, as well as the pervasive history of disability discrimination rising to the level of constitutional violations in the detention context, Title II's limited relief is congruent and proportional to the injury Congress sought to prevent and remedy in passing Title II.

In the detention context, as in the access-to-courts context at issue in *Lane*, Title II protects not only the Equal Protection Clause's "prohibition on irrational disability discrimination," but also "a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review."  *See Lane*, 541 U.S. at 522-523.  As Justice Stevens noted in *United States v. Georgia*, the prison context implicates a "constellation of rights."  546 U.S. 151, 162 (2006) (Stevens, J., concurring).  Such rights include: (1) the Equal Protection Clause's protection from arbitrary and irrational discrimination, *see Lane*, 541 U.S. at 540; (2) fundamental rights subject to heightened scrutiny under the Due Process Clause, such as the right of access to the courts, *see Younger v. Gilmore*, 404 U.S. 15 (1971); *Johnson v. Avery*, 393 U.S. 483 (1969); *Ex parte Hull*, 312 U.S. 546 (1941), the right to "enjoy substantial religious freedom," *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974), the right to marry, *see Turner v. Safley*, 482 U.S. 78, 95 (1987), and the right to free speech, *see Pell v. Procunier*, 417 U.S. 817,

822 (1974); (3) the Due Process Clause's promise of fair proceedings, including in the denial of benefits or programs created by state regulations and policies, *see, e.g.*, *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) (parole); *Wolff*, 418 U.S. at 557 (good time credits); *id.* at 571-572 & n.19 (solitary confinement); *Gagnon v. Scarpelli*, 411 U.S. 778 (1973) (probation), in the administration of antipsychotic drugs, *see Washington v. Harper*, 494 U.S. 210, 221-222 (1990), involuntary transfer to a mental hospital, *see Vitek v. Jones*, 445 U.S. 480, 494 (1980), and parole hearings, *see Young v. Harper*, 520 U.S. 143, 152-153 (1997); and (4) the Eighth Amendment right to be free from cruel and unusual punishment, which includes restrictions on use of excessive physical force, *see Hudson v. McMillian*, 503 U.S. 1 (1992), the "unnecessary and wanton infliction of pain," *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (citations omitted), and deliberate indifference to serious medical needs, *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976),  as well as the affirmative duties to "ensure that inmates receive adequate food, clothing, shelter, and medical care," *Farmer*, 511 U.S. at 832-833, and to "take reasonable measures to guarantee the safety of the inmates," *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).

For inmates with disabilities, the pattern of constitutional violations in detention settings has been pervasive.  The United States submitted a brief as an intervenor in *Johnson v. Neiman*, 504 F. App'x 543 (8th Cir. 2013),[8] detailing the long history of violations and arguing that, as a result, in passing Title II, Congress validly abrogated sovereign immunity in the prison context. *See* Br. for the United States as Intervenor at 28-40.[9]  The United States correctly concluded that "[a]gainst that background of discrimination, Title II of the ADA is well tailored in the prison context – as in others – to protect against and remedy constitutional violations without infringing on public entities' legitimate prerogatives."  *Id.* at 41.

---

[8] The Eighth Circuit ultimately declined to reach the sovereign immunity question because it held that the Title II claim was not meritorious.  *Johnson*, 504 F. App'x at 545-46.

[9] *Available at* https://www.justice.gov/crt/about/app/briefs/neimanbrief.pdf (July 23, 2012).

Indeed, given our nation's long and extensive history of violating the constitutional rights of inmates with disabilities, the remedies Congress created in passing Title II are quite limited. Title II only prohibits public entities from discriminating because of an individual's disability; public entities remain free to exclude individuals for other lawful reasons unrelated to disability. 42 U.S.C. § 12132.  Rather than requiring that public entities cease discriminatory conduct at any cost, Title II limits modifications to those that are "necessary," and "reasonable," and provides defenses for actions that would "fundamentally alter the nature of the service, program, or activity" 28 C.F.R. § 35.130(b)(7), or "result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens," 28 C.F.R. § 35.164 or pose a "direct threat to the health or safety of others."  28 C.F.R. § 35.139(a).  Title II also excuses public entities from remedying architectural accessibility barriers in several circumstances involving facilities pre-dating passage of the ADA.  *See* 28 C.F.R. § 35.151.

These important limitations on the scope of Title II "tend to ensure Congress' means are proportionate to ends legitimate under § 5." *Constantine*, 411 F.3d at 489 (quoting *City of Boerne*, 521 U.S. at 533).  Because Title II's requirements are congruent and proportional to the constitutional violations they remedy and prevent in the detention context, Congress validly abrogated sovereign immunity. *See Zemedagegehu v. Arthur*, No. 1:15CV57 JCC/MSN, 2015 WL 1930539, at *15 (E.D. Va. Apr. 28, 2015) (In the "context of a local jail," sovereign immunity was validly abrogated by Title II in light of the "wide latitude given to Congress," and because Title II falls "within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional.") (quoting *Constantine*, 411 F.3d at 490).

### 2. Because Sovereign Immunity Is Abrogated in the Class of Prison Cases, the Court Need Not Determine Whether Each Title II Claim Constitutes a Constitutional Violation.

Defendants incorrectly argue that to decide whether sovereign immunity is validly abrogated for the purpose of applying the ADA to prisons, the Court must go claim by claim to determine whether each claim amounts to a Fourteenth Amendment violation.  Defs.' Mem. at 15-16.  *Lane*, however, established that abrogation of sovereign immunity under the ADA is

24

decided with respect to broad "classes of cases." *Lane*, 541 U.S. at 531 (finding Title II abrogation valid with respect to "the class of cases implicating the accessibility of judicial services"). In *Lane*, the Court did not engage in a fact or claim-specific inquiry in deciding whether Congress had validly abrogated immunity for the broad category of judicial services. Nor did the Court assess whether the plaintiffs in *Lane* had actually been prevented from appearing in court. *Id.* at 513-14. Instead, the Court framed the abrogation question broadly as relating "to the class of cases implicating the accessibility of judicial services." *Id.* at 531.

The Fourth Circuit followed suit in *Constantine*, where it held Title II validly abrogated sovereign immunity in the broad "context of public higher education," not simply with respect to the specific facts presented in that case. 411 F.3d at 488. In applying the three-part *City of Bourne* test, the Fourth Circuit considered the overall context of higher education, not whether the plaintiff's specific claims amounted to constitutional violations. *Id.* As the court explained:

> The remedial measures employed in Title II may not be a perfect fit for the pattern of discrimination that Congress sought to remedy and deter, but they need not be. The Court has made it clear that prophylactic legislation such as Title II "can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *City of Boerne,* 521 U.S. at 518, 117 S. Ct. 2157. Thus, the question is not *whether* Title II exceeds the boundaries of the Fourteenth Amendment, but *by how much.*

*Id.* at 490.

*Georgia* did not change this "class of cases" analysis. In *Georgia*, the Court simply held that where a plaintiff's particular Title II claim also constitutes a constitutional violation, sovereign immunity is validly abrogated for that claim alone, even if the claim is part of a broader class of cases where Congress's abrogation of sovereign immunity would be invalid. 546 U.S. at 159. The Court did not have to reach the issue of whether sovereign immunity was validly abrogated in the class of prison or conditions of confinement cases because it could reverse the Eleventh Circuit's decision on the narrower ground that where a claim constituted a constitutional violation, sovereign immunity would of course be abrogated for that claim. *Id.* at 158 (reasoning that "[w]hile the Members of this Court have disagreed regarding the scope of

Congress's 'prophylactic' enforcement powers under § 5 of the Fourteenth Amendment . . . no one doubts that § 5 grants Congress the power to 'enforce . . . the provisions' of the Amendment by creating private remedies against the States for *actual* violations of those provisions").

Because the class of detention cases satisfies each of the three *City of Bourne* factors, this Court should hold that sovereign immunity is validly abrogated in this prison case and need not assess each of Plaintiffs' claims independently. Nevertheless, as explained in Section II above, several of Plaintiffs' claims independently constitute constitutional violations: (1) claims related to denial of access to the grievance process, to the law library, and to the courts constitute a violation of the Fourteenth Amendment because they represent infringement of the right to access the courts; and (2) claims related to the Defendants' failure to allow Plaintiffs to navigate prison independently, read and write independently, reside in facilities with appropriate security levels, and reside safely in single cells, amount to claims of cruel and unusual punishment in violation of the Eighth Amendment, which applies to the states through the Fourteenth Amendment, *see Rhodes*, 452 U.S. at 345. In addition, some of Plaintiffs' claims also violate the Equal Protection Clause of the Fourteenth Amendment, because Defendants' policies are not rationally related to a legitimate government interest. Thus, even if the Court does not find that Congress validly abrogated sovereign immunity in the class of prison cases, it should preserve these portions of Plaintiffs' Title II claims that also constitute Fourteenth Amendment violations.

## IV.     Plaintiffs Have Adequately Pled ADA and Section 504 Claims.

Plaintiffs have sufficiently pled violations of Title II and Section 504. Defendants' attempt to impose a heightened pleading standard akin to that for fraud under Federal Rule of Civil Procedure 9(b) should be rejected. To state a *prima facie* case under the ADA or Section 504, Plaintiffs must show that they: "(1) have a disability; (2) are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502-03 (4th Cir. 2016); *see Seremeth*, 673 F.3d at 336 n.1 ("Claims under the ADA's Title II and the Rehabilitation Act can be combined

for analytical purposes because the analysis is substantially the same.") (internal quotation marks omitted).  Intent is not required for injunctive relief under the ADA and Section 504 and, to the extent intent is required to recover damages, Plaintiffs have sufficiently alleged it.

**A.  Intent Is Not Required for Injunctive Relief under Title II and Section 504.**

Plaintiffs allege claims of disparate treatment, failure to provide reasonable modifications, and failure to ensure equally effective communication, as well as retaliation.  Both the ADA and § 504 of the Rehabilitation Act contemplate *respondeat superior* liability. "Under the ADA and similar statutes, liability may be imposed on a principal for the statutory violations of its agent," rather than only for an official "*policy* of discrimination." *Rosen v. Montgomery Cty.*, 121 F.3d 154, 157 n.3 (4th Cir.1997) (emphasis in original).  Nowhere do the Title II regulations require intent to establish liability.  Thus, courts have consistently found that a plaintiff need not prove that a defendant's discriminatory acts were intentional to prevail in seeking injunctive relief.  *See, e.g.*, *Baird* ex rel. *Baird v. Rose*, 192 F.3d 462, 470 (4th Cir. 1999) (When intentional discrimination is absent, "relief is limited to declaratory and injunctive relief, costs, and attorney's fees."); *Frame v. City of Arlington*, 657 F.3d 215, 239, n.124 (5th Cir. 2011) (Money damages are only available under ADA Title II and Section 504 for intentional discrimination.); *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846 (7th Cir. 1999) ("We cannot accept the suggestion that liability under Title II of the [ADA] must be premised on an intent to discriminate on the basis of disability.").

While courts have held that intent is required to obtain compensatory damages, intent is presumed for disparate treatment claims.  *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 830 (4th Cir. 1994) ("[I]ntentional discrimination" is treated as synonymous with discrimination resulting in "disparate treatment," which contrasts with "disparate impact") (quoting *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 584 n.2 (1983)); *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 373 (D. Md. 2011) (same).  Plaintiffs allege that Defendants engaged in disparate treatment by placing some Plaintiffs in medium security facilities in contravention of their security classifications, by denying blind inmates orientation training and assigning unqualified

27

walkers, by excluding blind inmates from work programs, and by housing blind inmates in double cells despite individual safety needs.  In addition, as discussed above, Defendants' policies of using only print materials for grievance processes, orientation, and educational materials, and refusing to provide or even allow inmates to possess auxiliary aids needed to read print material are also intentional.

Reasonable modification, effective communication, and retaliation claims are also subject to compensatory damages upon a showing of intentional discrimination. *See, e.g.*, *Paulone*, 787 F. Supp. 2d at 373-74; *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996); *Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1106-11, 1116 (9th Cir. 1987). However, a plaintiff need not show "discriminatory animus" to prevail on a claim for damages under the ADA or Section 504.   It is sufficient for the plaintiff to show that the defendant acted "knowingly, voluntarily, and deliberately," even if the defendant's violations "resulted from mere thoughtlessness and indifference rather than because of any intent to deny Plaintiff's rights."  *Paulone*, 787 F. Supp. 2d at 373-74 (internal quotation marks omitted); *see Bartlett v. New York State Bd. of Law Examiners*, 970 F. Supp. 1094, 1151 (S.D.N.Y. 1997) (holding that "while defendants may have had the best of intentions, and while they may have believed themselves to be within the confines of the law, they nevertheless intentionally violated the ADA and the Rehabilitation Act by willfully withholding from plaintiff the reasonable accommodations to which she was entitled under the law," where "[t]hey had notice of the potential risk of their decision, and clearly refused the accommodation knowingly").

In *Proctor v. Prince George's Hospital Center*, this Court held that compensatory damages were available to a deaf plaintiff against a hospital for its failure to provide interpreters. 32 F. Supp. 2d 820 (D. Md. 1998). In holding that the plaintiff need only show deliberate indifference to establish the requisite intent for damages, the Court noted it is "not enough merely to believe that one's actions do not constitute a violation of the law if such a belief represents a miscalculation." *Id.* at 829 (internal quotation marks omitted).

Plaintiffs have sufficiently alleged disparate treatment, failure to accommodate, and failure to ensure equally effective communication, as well as retaliation, and have specifically alleged that DPSCS and Mr. Moyer were aware of their policies, their employees' actions, and the applicable law. *See, e.g.*, Am. Compl. at ¶¶ 23, 46, 52, 58, 65, 71, 76, 84, 94, 115, 135.

Numerous courts, encountering similar policies to those at issue here have found civil rights violations. *See, e.g.*, *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 74 (2nd Cir. 2016) (System requiring inmate to seek assistance from willing inmates was not effective accommodation under ADA and Section 504.); *Armstrong v. Brown*, 732 F.3d 955, 960 (9th Cir. 2013) (finding systemic ADA violations where prison denied "accessibility devices, such as tapping canes, to blind class members," and placed them in "the vulnerable position of being dependent on other inmates to enable them to obtain basic services, such as meals, mail, showers, and toilets"); *Washington v. Corr. Med. Servs.*, No. 05–3715, 2006 WL 3833466, at *4 (D.N.J. Dec. 29, 2006) ("It is no answer that Plaintiff somehow managed to reach the bathroom . . . by clinging to the walls, or relying on the assistance of other inmates."); *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1041-42 (S.D.N.Y. 1995) (using inmates as interpreters for deaf inmates during medical appointments violates their right to privacy in medical information); *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1219-20 (9th Cir. 2008) (Assistance rendered by other inmates is an inadequate remedy for inaccessible facilities.); *Wright v. N.Y. State Dep't of Corr.*, 242 F. Supp. 3d 126, 138 (N.D.N.Y. 2017) ("In a normal prison setting, it is easy to envision the ramifications an inmate could endure if he reports a fellow inmate to an officer. It is even more unsettling to imagine the consequences facing an inmate who 'snitches' on another inmate and then, must rely upon his fellow inmates to provide him with access to programs, yard, meals, bathroom, and other basic services.").

**B.  Plaintiffs Alleged They Are Denied Effective Access to Orientation Materials.**

Defendants argue that Plaintiffs do not allege that their provision of the Inmate Handbook and other orientation materials exclusively in standard print is wholly ineffective. Defs.' Mem. at 19. Yet Plaintiffs need not show that a method of communication is totally ineffective to state

a claim under Title II and Section 504; they need only establish that Defendants' methods of communication with them are not "*as* effective as" communications with sighted inmates. *See* 28 C.F.R. § 35.160(a)(1), (b)(1) (emphasis added). The Title II regulations further provide that Defendants must provide auxiliary aids and services to ensure equally effective communication, which means that documents "must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." *Id.* § 36.160(b)(1)-(2). Plaintiffs have adequately alleged Defendants have failed to provide the handbook and orientation materials in accessible formats or to provide auxiliary aids or services that would allow Plaintiffs to access these materials in a private and independent manner. Am. Compl. ¶¶ 4, 29-30. Furthermore, reliance on sighted inmates is not an effective aid because they are not qualified, they cannot always be "persuaded to help," they often require payment, and such reliance exposes Plaintiffs "to a substantial risk of exploitation and abuse." *Id.* ¶¶ 4, 40; *see* 28 C.F.R. § 35.104 ("Qualified reader means a person who is able to read effectively, accurately, and impartially using any necessary specialized vocabulary"). "[I]t is no answer that Plaintiff somehow managed" to access the vital information that Defendants refused to provide them in an accessible format. *Washington*, 2006 WL 3833466, at \*4.

Plaintiffs' allegations that Defendants' failure to provide them with accessible versions of the handbook and orientation materials exposes them "to the risk of discipline or confrontations with correctional officers or other inmates because of unknowing rule violations" are also sufficient. Am. Compl. ¶ 30. Defendants incorrectly base their argument for a heightened actual injury standard under the ADA on *Levy v. Mote*, which discussed actual injury in the context of determining whether the plaintiff continued to have Article III standing in light of remedial measures since filing of the lawsuit. 104 F. Supp. 2d 538, 541-44 (D. Md. 2000). *Levy*'s discussion of actual injury, therefore, was in the context of determining whether an Article III controversy remained, not whether the plaintiff had stated a *prima facie* case.

Finally, Defendants erroneously argue that Plaintiffs must demonstrate that Defendants denied specific requests to show discriminatory intent. Defs.' Mem. at 20. Notably, Plaintiffs

allege that Defendants' process for making such requests is also inaccessible.  Am. Compl. ¶¶ 32-33.  But a public entity is required to make reasonable modifications to accommodate people with disabilities, whether or not an auxiliary aid or modification is requested, when both the disability and the need for modification are obvious. *McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 WL 2331055, at \*7 (S.D. Tex. Aug. 9, 2006) (collecting cases). Here, Defendants segregated Plaintiffs at RCI, regardless of their security classification, Am. Compl. ¶ 75, but then failed to provide orientation materials in any format that a blind person could read. This failure constitutes intentional discrimination or deliberate indifference. *Id.* ¶¶ 115, 135.

### C.  Plaintiffs Adequately Pled Denial of Access to the Courts and Law Library.

Defendants correctly state that a "qualified reader" can be an acceptable auxiliary aid or service for blind individuals, yet fail to appreciate that they have not provided Plaintiffs with qualified readers.  Defs.' Mem. at 20.  Forcing Plaintiffs to pay for assistance from sighted inmates is not akin to providing them with qualified readers at Defendants' expense.  *See* Am. Compl. ¶¶ 40, 42 (alleging that Plaintiffs had to pay for sighted assistance).  Plaintiffs allege that the readers they obtain for themselves (which are not provided by DPSCS at all)[10] were not qualified, *id.* ¶ 88, were not always available or willing to assist, *id.* ¶¶ 4, 38, 41, 42, and misused information, *id.* ¶ 70.  Plaintiffs also allege that Defendants retaliated against sighted inmates who assisted them in filing grievances and court filings, *Id.* ¶ 43, and that relying on sighted inmates places them at risk of extortion, sexual exploitation, and violence.  *Id.* ¶ 39.  Defendants further argue that effective communication does not require privacy or independence.  However, the Title II regulations state that, "to be effective, auxiliary aids and services must be provided in . . . such a way as to protect the privacy and independence of the individual with a disability."  28 C.F.R. § 35.160(b)(2).

The cases Defendants cite to argue that Plaintiffs' use of sighted inmates constitutes effective access are inapposite.  In *Havens v. Colorado Department of Corrections*, the defendant

---

[10] Not only were these sighted readers not provided by DPSCS, but DPSCS actually discouraged sighted inmates from acting in this role.  Am. Compl. ¶ 43, 44.

provided multiple auxiliary aids and services, such as full-time aides, computer access, and access to accessible legal resources, books, and media. 897 F.3d 1250, 1267 (10th Cir. 2018). Plaintiffs received none of these aids and services. In *Wells v. Thaler*, the blind plaintiff "was permitted to complete legal research and prepare filings with the assistance of a prisoner of his request." 460 F. App'x 303, 308 (5th Cir. 2012). Likewise, the plaintiff in *Mason v. Correctional Medical Services, Inc.*, had an inmate reader of his choice who was both available to read to him on request and recorded texts on tape for him when asked. 559 F.3d 880, 887 (8th Cir. 2009). Unlike Plaintiffs here, the plaintiffs in *Wells* and *Mason* did not allege they were extorted or threatened because of the auxiliary aids and services they received, nor did they allege that there were times they could not afford to pay sighted inmates to help them.

Finally, Defendants' arguments that Plaintiffs must allege specific requests for auxiliary aids that Defendants denied and that Plaintiffs failed to sufficiently plead actual injury fail for the reasons explained in Section IV.B.

### D.  Plaintiffs Adequately Pled Denial of Access to the Mail.

In attacking the adequacy of Plaintiffs' allegations that they were denied access to the mail, Defendants again suggest that they provide Plaintiffs with qualified readers in accordance with the ADA and Section 504. Defs.' Mem. at 22. Yet Defendants ignore Plaintiffs' allegations that Defendants provided no assistance at all. Plaintiffs had to secure assistance on their own at their own expense, and some of the sighted inmates on whom Plaintiffs relied then used the information to exploit Plaintiffs and their family. Am. Compl. ¶ 70. Defendants assert that Plaintiffs have pled only hypothetical injuries. But there is nothing hypothetical about having confidential and family contact information exploited by another inmate or being dependent on another inmate's mood for the necessity of communication with the outside world, including both attorneys and loved ones.

Neither of the cases Defendants cite deals with discrimination of any kind, let alone disability discrimination. In *Chase v. O'Malley*, 466 F. App'x 185, 187 (4th Cir. 2012), the plaintiff challenged prison officials' treatment of his mail, not a policy forcing him to rely on

other inmates to read and write mail. In *Jones v. Bishop*, No. CV CCB-16-2893, 2018 WL
1521874, at *15 (D. Md. Mar. 28, 2018), the plaintiff tried to claim mail tampering, a claim
distinct from Plaintiffs' claims in this case.

### E.   Plaintiffs Adequately Pled Denial of Access to Work and Educational Programs.

Defendants claim that Plaintiffs allege denial of access only to "unspecified" work and
educational programs. Defs.' Mem. at 23. Yet Plaintiffs assert that classes at RCI are
inaccessible to them because they use printed materials that are not provided in accessible
formats.  Am. Compl. ¶ 55.  Plaintiffs allege that they have been forced to drop out of classes
because they could not read the materials and were denied extra time on exams. *Id.* ¶ 56.
Plaintiffs further allege that they have no access to basic literacy classes, because Defendants
have refused to provide competent instruction in Braille.  *Id.* ¶ 57.  In light of these allegations, it
is unclear which complaint Defendants refer to when they conclude that "the complaint makes
clear that plaintiffs were given the same educational opportunities as other inmates," Defs.'
Mem. at 24.

Similarly, with respect to work, Plaintiffs allege that they wish to participate in the
Maryland Correctional Enterprises program, but that Defendants exclude blind inmates.  *Id.* ¶ 50.
Plaintiffs further allege that they have "been relegated to jobs that pay less and offer fewer
diminution credits and opportunity for vocational training" because Defendants refuse to allow
Plaintiffs to work certain jobs based on unfounded safety concerns and stereotypes about blind
people.  *Id.* ¶ 49.  The allegations are sufficient to state claims under Title II and Section 504.

### F.   Plaintiffs Adequately Pled That Defendants Prevented Them from Independently Navigating and Accessing RCI's Facilities and Services.

In attacking Plaintiffs' claim regarding navigation of Defendants' facilities, Defendants
again appear to refer to a different complaint when they claim that Plaintiffs have failed to allege
that their assigned escorts "caused any actual harm or injury." Defs.' Mem. at 26.[11]  To the

---

[11] None of the cases Defendants cite support the proposition that it is permissible for a prison
official to force one inmate to be dependent for basic necessities on another inmate whom the
official made no effort to screen. Even *Colon*, the only case Defendants cite that refers to an

contrary, Plaintiffs allege that their walkers threatened them when they complained about their behavior, not that their walkers never harmed them. Am. Compl. ¶ 63. Furthermore, it takes no great leap of imagination to understand why Plaintiffs would not describe specific assaults by specific escorts in their complaint. For all intents and purposes, Plaintiffs were in the custody of the inmates Defendants assigned to escort them. Naming names would have exposed Plaintiffs to immediate and harsh retaliation. Indeed, Plaintiffs had already faced retaliation for participating in this litigation by the time they filed their amended complaint. Am. Compl. ¶ 44.[12]

### G. Plaintiffs Adequately Pled That Segregating Them at RCI and Double-Celling Them Without Regard to Safety Violated the ADA and Section 504.

Defendants misread Plaintiffs' allegations concerning segregation at RCI and double-celling as demanding an entitlement to housing of their choosing. Plaintiffs have never alleged that they are entitled to housing of their choosing; they allege only that Defendants should consider their safety before double-celling them, Am. Compl. ¶ 78, and should place them in housing appropriate to their security classifications rather than segregating all blind prisoners at RCI, *id.* ¶ 75.

With regard to Plaintiffs' segregation claim, courts have rejected segregation schemes similar to Defendants'. *See, e.g.*, *Pierce*, 526 F.3d at 1221 (a public entity "may not shunt the disabled into facilities where there is no possibility of access" to certain programs); *Henderson v. Thomas*, 913 F. Supp. 2d 1267, 1295 (M.D. Ala. 2012) (holding that a blanket policy of segregating HIV-positive prisoners, "regardless of their individual circumstances . . . denies plaintiffs the individualized determinations to which they are entitled under the ADA").

---

assault, involves an assault by an inmate wholly unrelated to the defendant, not by an escort hired by the defendant. 2017 WL 4157372, at *7.

[12] Defendants also try to introduce an impermissible question of fact by asserting, with no support, that a prison "poses unique obstacles for independent navigation by the blind." Defs.' Mem. at 26. Perhaps Defendants' factual assertion is correct, or perhaps a prison, which has no streets to cross, no complicated indoor environments to navigate, and no winding or overgrown pathways to traverse, is actually easier to navigate than most cities and college campuses. Such determinations should be left to the finder of fact, not made without reference to an evidentiary record as a matter of law.

Although Plaintiffs do not claim any special entitlement to housing of their choice, Plaintiffs are entitled to nondiscriminatory housing assignments. As they allege in their complaint, Plaintiffs with security levels lower than medium level II are harmed by being segregated at RCI, where inmates are "more heavily supervised and more restricted in their movement" than prisoners at lower-security facilities, and because they lack "access to all of the same services and programs available at lower-security facilities."  Am. Compl. ¶ 74.

Plaintiffs have also sufficiently alleged that Defendants' practice of double-celling blind inmates without regard to their safety needs places them in danger by making them "more vulnerable to theft and less able to forestall or defend against attacks."  *Id.* ¶ 79; *see id.* ¶¶ 80-81 (describing other dangers of double-celling).  The fact that some Plaintiffs are housed in single cells and all were previously is not, as Defendants maintain, a concession, but rather a showing that the requested modification to housing assignment rules is reasonable.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.

Respectfully submitted,

Date: January 24, 2019                                         _____
                                                                                    */s/*
                                                              Stephen Z. Meehan (Federal Bar No. 23915)
                                                              Damien Dorsey (Federal Bar No. 19194)
                                                              Prisoner Rights Information System of MD, Inc.
                                                              P.O. Box 929
                                                              Chestertown, Maryland 21620
                                                              Telephone: 410-528-1400
                                                              Telecopier: 410-528-1550
                                                              Electronic Mail: smeehan@prisminc.org

                                                              _____
                                                                                    */s/*
                                                              Eve L. Hill (Federal Bar No. 19938)
                                                              Jessica P. Weber (Federal Bar No. 17893)
                                                              Abigail Graber (Federal Bar No. 19727)
                                                              James T. Fetter (Federal Bar No. 20727)
                                                              Brown, Goldstein & Levy, LLP
                                                              120 E. Baltimore Street, Suite 1700

Baltimore, Maryland 21202
(410) 962-1030 (phone)
(410) 385-0869 (fax)
ehill@browngold.com
agraber@browngold.com
jweber@browngold.com
jfetter@browngold.com

*Attorneys for Plaintiffs*