IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STEVEN BROWN, *et al.*, | * | |
| Plaintiffs, | * | |
| | | Civil Action No. RDB-16-0945 |
| v. | * | |
| DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, *et al.*, | * | |
| | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

In these consolidated cases, nine blind or visually impaired inmates formerly or presently housed in correctional facilities maintained by the Maryland Department of Public Safety and Correctional Services have challenged the conditions of their confinement. (Consolidation Order, ECF No. 2.) Together, Plaintiffs Steven Brown ("Brown"), Wilbert M. Delano ("Delano"), Gregory Hammond ("Hammond"), Sedric Holley ("Holley"), Russell Hopkins ("Hopkins"), Johnny James ("James"), Tyrell Polley ("Polley"), Maynard Snead ("Snead"), and Robert Wilson ("Wilson") (collectively, "Plaintiffs") allege that Defendants Department of Public Safety and Correctional Services (the "Department"), Dayena Corcoran ("Corcoran"), Richard Miller ("Miller"), and Stephen Moyer ("Moyer")[1] have deprived them of their right to access the courts, subjected them to cruel and unusual punishment, and discriminated against them on the basis of their disabilities. Their Amended Complaint (ECF

---

[1] While this case was pending, Robert L. Green ("Green") became the Secretary of the Department of Public Safety and Correctional Services. Pursuant to Rule 25(d), Green is hereby substituted for Moyer with respect to all official capacity claims brought against Moyer. Plaintiffs' Motion for Substitution or for Judicial Notice of Substitution under Federal Rule of Civil Procedure 25(d) (ECF No. 208) is GRANTED.

No. 23) brings two Counts pursuant to 42 U.S.C. § 1983 (Counts I and II), a third Count under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.* (Count III), and a fourth Count invoking Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Count IV).

Currently pending before this Court are Defendants' Motion to Dismiss (ECF No. 100); Plaintiffs' Motion for Partial Summary Judgment (ECF No. 172); Defendants' Motion for Summary Judgment (ECF No. 178); Plaintiffs' Motion for Leave to File a Surreply (ECF No. 207); and Plaintiffs' Motion for Substitution or for Judicial Notice of Substitution under Federal Rule of Civil Procedure 25(d) (ECF No. 208). On April 24, 2019 this Court conducted a Motions Hearing and heard argument on the pending motions. *See* Local Rule 105.6 (D. Md. 2018). For the reasons stated below, Defendants' Motion to Dismiss (ECF No. 100) is DENIED AS MOOT; Plaintiffs' Motion for Partial Summary Judgment (ECF No. 172) is DENIED; and Defendants' Motion for Summary Judgment (ECF No. 178) is GRANTED IN PART AND DENIED IN PART; Plaintiffs' Motion for Leave to File a Surreply (ECF No. 207) is GRANTED;[2] and Plaintiffs' Motion for Substitution or for Judicial Notice of Substitution under Federal Rule of Civil Procedure 25(d) (ECF No. 208) is GRANTED. Summary Judgment IS ENTERED in favor of all Defendants on Counts I and II. Counts III and IV will proceed as to the Department and Robert L. Green in his official capacity, commencing on Monday, June 17, 2019.

## BACKGROUND

---

[2] Plaintiffs' Surreply addresses newly-cited evidence introduced by Defendants during the Motions Hearing. Because the Surreply concisely addresses this novel issue, Plaintiffs are GRANTED leave to file the Surreply. (ECF No. 207-1.)

In ruling on the pending motions for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). Plaintiffs allege that Defendants have subjected them to constitutional deprivations and discriminated against them on the basis of their disabilities. All nine Plaintiffs suffer from varying degrees of visual impairment. (Am. Compl. ¶¶ 13-21; PSJ[3] Ex. 1.) When Plaintiffs commenced this action by filing nine *pro se* Complaints in March 2016, all Plaintiffs were incarcerated at the Roxbury Correctional Institution ("RCI"). Some Plaintiffs have also been housed at other institutions like Eastern Correctional Institution ("ECI"), Patuxent Institution, and the Maryland Reception, Diagnostic and Classification Center ("MRDCC"). (ECF Nos. 1, 3.) Since the filing of this case, five Plaintiffs (Delano, Hammond, Holley, Hopkins, and Polley) have been released.

## I.      Structure of the Department.

The Department of Public Safety and Correctional Services is overseen by the Department Secretary. (PSJ Ex. 16.) Within the Department, the Commissioner of Correction supervises the wardens at each prison. (PSJ Ex. B, Corcoran Dep. 46:13-20.) Roxbury Correctional Institution ("RCI") and Eastern Correctional Institution ("ECI") are facilities within the Division of Correction, each of which is managed by a Warden or Acting Warden. (PSJ Ex. C, Campbell 30(b)(6) Dep.; Ex. D, West 30(b)(6) Dep.)

---

[3] In accordance with the Plaintiffs' citation practices, this Court references exhibits attached to the Plaintiffs' Motion for Partial Summary Judgment (ECF No. 172) as "PSJ" and those attached to Defendants' Motion for Summary Judgment (ECF No. 178) as "DSJ". Exhibits attached to the Responses and Replies to these Motions are referenced using a similar shorthand (*e.g.*, Defs.' Reply or Pls.' Resp).

Defendant Stephen Moyer was the Secretary of the Department since January 2015. (DSJ Ex. 11, Moyer Dep. 18:5-16.) In this position, he managed approximately 10,000 employees and a $1.4 billion budget. (*Id.* at 32:9-33:15.) He was heavily involved in coordination efforts between his Department and other Maryland political bodies and had little involvement in the day-to-day operations at Department facilities: his work included preparing and participating in budgetary hearings and meetings with the Governor's Office and the Department of Legislative Affairs, monitoring pending bills, and meeting with other cabinet members. (*Id.* at 32:2-34:5, 36:2-38:1.) On March 7, 2019, Moyer announced his departure from state service effective at the end of that month. (Defs.' Mot. Summ. J. 5, n.4.) While this case was pending, Robert L. Green ("Green") became the Secretary of the Department of Public Safety and Correctional Services.

Defendant Dayena Corcoran was the Commissioner of Correction for the Department from 2016 until September 2018. (DSJ Ex. 12, Corcoran Dep. 46:10-12, 48:2-10.) In that role, she was responsible for implementing and enforcing Division of Correction policies and managed the wardens. (*Id.* at 46:10-47:14, 99:3-20.) Defendant Richard Miller was the Warden of RCI from April 2015 to November 2017. (DSJ Ex. 13, Miller Dep. 25:10-16.) His job required him to manage the operations of the entire RCI facility, including over 400 employees and 1,800 inmates. (*Id.* at 57:2-58:2.)

The Department contracts with the Maryland Department of Labor, Licensing and Regulation ("Department of Labor") to provide educational, vocational shop, and library programs, services, and activities at RCI and ECI. (PSJ Ex. 17; Ex. E, Reid 30(b)(6) Dep. 172:7–10, 190:4–8, 192:5–11.) The Department also contracts or otherwise arranges with

third-party entities to provide medical services and other programs, services, and opportunities to inmates at RCI. (PSJ. Ex. F, Baucom 30(b)(6) Dep. 37:10– 38:9; Ex. E, Reid 30(b)(6) Dep. 291:4–292:11.)

## II. Services Provided at RCI.

Plaintiffs generally complain that Defendants have provided inadequate aids and services to permit them to conduct their affairs in prison privately and independently. Because they have been denied adequate training or other services, they complain that they have been forced to rely on other inmates to complete various tasks like filing grievances and court complaints, reading and writing correspondence, and navigating prison facilities. They also complain that they have been forced to share prison cells with other inmates, a practice the parties refer to as "double-celling" (as opposed to being celled alone, or "single-celling") and that they have been excluded from various programs on the basis of their visual impairments, including desirable jobs. The net effect of all this, Plaintiffs complain, is that they have been rendered vulnerable to violence and extortion at the hands of sighted inmates and they have been denied benefits accorded to other inmates, including additional diminution credits.[4] In the following pages, these grievances are discussed in greater detail.

### A. Housing Blind Inmates at RCI and ECI.

Defendants admit that RCI, a medium security facility, was and continues to be the designated Department facility for blind inmates, regardless of their security classification. (PSJ Ex. E, Reid 30(b)(6) Dep. 37:15–18; Ex. C, Campbell 30(b)(6) Dep. 29:16–17, 194:5–7,

---

[4] Diminution credits offer a means by which inmates can reduce the length of their sentences.

414:18–20; Ex. K, Baker Dep. 103:21–104:14; Ex. M, Gelsinger Dep. 122:5–7; Ex. N, Hershberger Dep. 19:14–16.) Although some inmates with visual impairments have been housed at ECI, once an inmate's visual impairment becomes sufficiently severe, they are sent to RCI because ECI does not "have the accommodations that Roxbury Correctional Institution has" for the blind. (PSJ Ex. D, West 30(b)(6) Dep. 60:7–61:5.) With the exception of a few days spent at other facilities, all Plaintiffs have spent all or the majority of their incarceration at RCI, with some Plaintiffs (Hammond and Wilson) also housed at ECI for significant periods. (PSJ Ex. 27; Ex. 28; Ex. 29; Ex. 30; Ex. 31; Ex. 32, at 1676; Ex. 33, at 183; Ex. 12, at 1084–85; Ex. J-78, at POLLEY 420–21; Ex. 14; Ex. 34.3.) Plaintiffs Brown, James, Snead, and Wilson remain incarcerated at RCI. (*See* PSJ Ex. 35; Ex. 12, at 1084–85; Ex. 14; Ex. D, West 30(b)(6) Dep. 44:8–20.)

### B. Communications with Blind Inmates.

The Department provides access to many of its programs, activities, and services through reading and writing but does not provide documents in alternative formats that blind inmates can access independently, such as large print, audio, Braille, or accessible electronic formats that could be accessed on a computer with the use of a screen reader or screen magnification software. (PSJ Ex. E, Reid 30(b)(6) Dep. 116:19–117:19, 201:11–16; Ex. C, Campbell 30(b)(6) Dep. 128:14–21; Ex. M, Gelsinger Dep. 108:11–109:18; Ex. D, West 30(b)(6) Dep. 51:15–52:15; *see* Ex. 19, Olivero Rpt. 6, 20–27 (discussing alternative formats for print usable by blind people)).

When inmates want to make a request or register a complaint, they can use either an informal or formal grievance process, each of which relies on the submission of a print form.

The informal request process depends on submission of an informal complaint form or another written document. (PSJ Ex. C, Campbell 30(b)(6) Dep. 99:21–100:11; Ex. D, West 30(b)(6) Dep. 50:21–51:14.) That form is not available in any alternative formats. (PSJ Ex. E, Reid 30(b)(6) Dep. 116:15-117:19; Ex. D, West 30(b)(6) Dep. 51:15–52:15.) The formal complaint process, known as the administrative remedy procedure ("ARP"), requires use of a print form that is not available in large print or any other accessible format. See Ex. E, Reid 30(b)(6) Dep. at 201:11–16 (stating that the ARP form is not available in large print and that "we are not allowed to manipulate forms").

It is undisputed that no staff are explicitly assigned to act as readers and scribes for visually impaired inmates. The RCI Inmate Handbooks and Department of Public Safety and Correctional Services and Department of Corrections Directives make no mention of any staff position or inmate assignment to provide these services, but the case management manual does specify that "case managers are to assist inmates as required or as requested." (PSJ Ex. C, Campbell 30(b)(6) Dep. 122:2-8; E-94; Ex. G-102; Ex. D-124; Ex. I-3.) Former RCI Warden Gregg Hershberger and former Commissioner Dayena Corcoran described staff assistance to blind inmates as voluntary. (PSJ Ex. B, Corcoran Dep. 94:9–95:9; see Ex. N, Hershberger Dep. 88:3–9.)

Defendants assign sighted inmates as escorts, or "walkers," for blind inmates to help them navigate the prison. (PSJ Ex. 49, The Department's Supp. Answers Delano Interrog. No. 8 (Mar. 13, 2019)). Inmate escort is a "preferred" job, the criteria for which are that the inmate be housed at RCI and off disciplinary segregation a certain number of days. (PSJ Ex. E-94, at S BROWN 140–141; Ex. E, Reid 30(b)(6) Dep. 214:13–215:17.) Sex offenders were

permitted to be walkers until 2018. (PSJ Ex. E, Reid 30(b)(6) Dep. 214:18–215:3; *see* Ex. E-5, at BROWN 3101–02; Ex. E-94, at S BROWN 140–41.) Defendants choose the inmates who serve as escorts without input from blind inmates. (PSJ Ex. K, Baker Dep. 147:20–148:3.) The former lieutenant for the housing unit containing the tier for blind inmates claimed to instruct his tier officers how to train walkers, and that the tier officers were tasked with training walkers. (Ex. A, Franklin Dep. 40:6–41:17.) Nevertheless, there is conflicting evidence of this topic: the former tier officer for the blind tier denied any such training existed (Ex. L, Conrad 20:4–6), as did Defendant's designee (Ex. E, Reid Dep. 223:14–224:12), and a former walker (Ex. U, Willey Dep. 50:3–15).

It is disputed whether inmate walkers are responsible for reading and writing for blind inmates. Maureen Reid, one of the Defendants' Rule 30(b)(6) designees,[5] testified that reading and writing for blind inmates is part of walker duties. (PSJ Ex. E, Reid 30(b)(6) Dep. 194:2-7.) Other evidence suggests that this help was discretionary. (PSJ Ex. U, Willey Dep. 67:10-70:18) (testimony of former walker for Russell Hopkins indicating that reading and writing for blind inmates was in his discretion); (PSJ Ex. 24, Job Duties for Inmates Assigned as Walkers) (declaring that walkers "may assist" the visually impaired inmate with any written correspondence). There is no dispute that inmate walkers are not required to have a GED or high school diploma, are not tested on their ability to read and write for inmates, and are provided no training in being a reader or scribe. (PSJ Ex. E, Reid 30(b)(6) Dep. 215:18–216:21; Ex. E-94, at S BROWN 140–41.)

---

[5] Pursuant to Rule 30(b)(6), private corporations, government agencies, and other entities must designate a person to testify on its behalf about information known or reasonably available to the organization.

### C. Work Assignments

Kitchen (or "dietary" or "food service") assignments allow inmates at RCI to earn 10 credits off their sentences ("diminution credits") per month, which can significantly reduce the length of a sentence. (PSJ Ex. E, Reid 30(b)(6) Dep. 236:15–237:14.) Other jobs, such as sanitation and laundry, earn only 5 credits a month. (PSJ Ex. 64.) There is evidence that Defendants excluded Plaintiffs from kitchen jobs because they were concerned about the safety of blind inmates operating unsupervised in a prison kitchen. (Defs.' Resp. Ex. 21; Ex. 22, Schenck Dep. 93:16-94:2; 129:17-130:2.) In 2016, Defendants created the "blind greeter" position within dietary, which is reserved for a blind inmate. (*Id.* at 117:18–118:13, 119:4–120:4.) The blind greeter's sole job is to greet correctional officers as they enter the officers' dining room and request that the officers sign a clipboard. (*Id.*) After numerous requests from Mr. Delano and Mr. Hopkins to be reassigned to the kitchen, Defendants placed Delano in the blind greeter position on February 25, 2016, and Hopkins in the blind greeter job in July 2017. (PSJ Ex. 68; Ex. 65; Ex. AA-151, at R HOPKINS 332–42; Ex. AA-149, at W DELANO 65, DELANO 563, W DELANO 67–68, 74.)

### D. Celling Arrangements

Almost all Plaintiffs were placed in double-cells at some point during their incarcerations. Hammond was double-celled around March 2016 (PSJ Ex. 53; 54); Delano was double-celled for various periods beginning in October 2017, February 2018, and again in March 2018 (PSJ Ex. 8); Brown was briefly double-celled between December 2014 and January 2015 (PSJ Ex. 7); Wilson was double celled from September 20, 2015 to March 29, 2017 (PSJ Ex. 15); and Polley was double-celled for some period in 2016. (PSJ Ex. 62.) The

Department's own medical contractor had recommended the assignment of a single-cell to many of these placements, and plaintiffs have submitted evidence to show that these recommendations were not always followed.

## III. Procedural History.

On March 30, 2016, this Court received ten identical pleadings filed by an unknown prisoner seeking appointment of counsel for nine visually impaired inmates. By Order of this Court, these cases were consolidated on April 4, 2016. (ECF No. 2.) The Order also granted the Plaintiffs' Motion for appointment of counsel. On April 5, 2016 Damien Dorsey of the Prisoner Rights Information System of Maryland ("PRISM") entered an appearance on behalf of the plaintiffs. (ECF No. 4.) Plaintiffs filed an Amended Complaint on September 7, 2016. (ECF No. 23.)

This Court granted Defendants numerous extensions of time to respond to the Amended Complaint. The deadline was extended to December 12, 2016 (ECF No. 30); to January 27, 2017 (ECF No. 32); to March 15, 2017 (ECF No. 34); to May 15, 2017 (ECF No. 37); to July 17, 2017 (ECF No. 39); to September 15, 2017 (ECF No. 41); to October 16, 2017 (ECF No. 44); and to December 15, 2017 (ECF No. 48). Defendants neither moved to dismiss the Complaint nor filed an Answer for over two years. Finally, on January 10, 2019, Defendants responded to the Complaint by moving to dismiss. (ECF No. 100.) This motion was filed in the midst of a tight discovery period set to end on March 1, 2019 and with trial set for April 22, 2019. In the Motion, Defendants asserted—for the first time in the history of this litigation—that they were immune to Plaintiffs' ADA claims. The Defendants have still not filed an Answer to the Complaint.

On March 18, 2019 Plaintiffs filed a Motion for Partial Summary Judgment seeking judgment on some of their claims brought pursuant to Title II of the ADA and Section 504 of the Rehabilitation Act (Counts III and IV). (ECF No. 172.) On March 19, 2019, Defendants filed a Motion for Summary Judgment, seeking Judgment on all of Plaintiffs' claims. (ECF No. 178.)

In light of the Defendants' Motion for Summary Judgment, Defendants' Motion to Dismiss is DENIED AS MOOT. Many of the substantive arguments of the Motion to Dismiss are incorporated into Defendants' Motion for Summary Judgment and are addressed herein. To the extent that Defendants contend that Plaintiffs' Amended Complaint lacks sufficient factual allegations, such arguments are rejected.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims

and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. University of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 572 U.S. 650, 656-59 (2014).

When both parties file motions for summary judgment, as here, this Court applies the same standard of review to both motions, considering "'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Defenders of Wildlife v. North Carolina Dept. of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007)). "[B]y the filing of a motion [for summary judgment,] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (citation omitted); *see also Sherwood v. Washington Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989) ("[N]either party waives the right to a full trial on the merits by filing its own motion."). "However, when cross-motions for summary judgment demonstrate a basic agreement

concerning what legal theories and material facts are dispositive, they "'may be probative of the non-existence of a factual dispute." *Syncrude Canada Ltd. v. Highland Consulting Group, Inc.*, 916 F. Supp. 2d 620 (D. Md. 2013) (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983)); *Georgia State Conference of NAACP v. Fayette County Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015).

## ANALYSIS

### I. Constitutional Claims Brought Pursuant to 42 U.S.C. § 1983 (Counts I and II).

In Counts I and II of the Amended Complaint, Plaintiffs assert constitutional violations under the auspices of 42 U.S.C. § 1983. Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." § 1983. Section 1983 does not create "substantive rights"; rather, it provides "a method for vindicating federal rights elsewhere conferred." *Thompson v. Dorsey*, ELH-10-1364, 2011 WL 2610704, at *3 (D. Md. June 30, 2011) (quoting *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807 (1994)).

In Count I, Plaintiffs allege that they have been denied access to the courts in violation of the Fourteenth Amendment of the United States Constitution. In Count II, Plaintiffs complain that they have been subjected to serious harm and a substantial risk of serious harm in violation of the Eighth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment. Plaintiffs assert these claims against Defendants Corcoran, Miller, and Moyer in their individual and official capacities. They seek compensatory

damages, punitive damages, and injunctive relief. Defendants move for Summary Judgment on these claims.

## A. Individual and Official Capacity Claims.

Plaintiffs advance Counts I and II against Corcoran, Miller, and Moyer in both their individual (or personal) capacities and their official capacities. In *Kentucky v. Graham*, 473 U.S. 159, 105 S. Ct. 3099 (1985), the Supreme Court articulated the distinction between these two suits, explaining that "personal capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" 473 U.S. at 165, 105 S. Ct. 3099 (1985) (citations omitted). By suing Corcoran, Miller, and Moyer in their official capacities, Plaintiffs seek to hold the Maryland Department of Public Safety and Correctional Services, and by extension the State of Maryland, liable for violations of Section 1983. *See Clark v. Maryland Dep't of Pub. Safety & Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009) ("[T]he Maryland Department of Public Safety and Correctional Services in undoubtedly an arm of the state for purposes of § 1983.)

Section 1983 only authorizes suits against "person[s]." 42 U.S.C. § 1983. In *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S. Ct. 2304 (1989), the United States Supreme Court held that neither a State nor its officials acting in their official capacities are "persons" who are subject to suit for money damages under Section 1983. 491 U.S. at 71. Judge Hollander of this Court has recently aptly noted that "[i]ndeed, § 1983 claims are not cognizable against states, state agencies, or state agents acting in their official capacities." *Graham v. Cox*, ELH-18-221, 2019 WL 1427860, at *10 (D. Md. March 29, 2019). Section

1983 "creates no remedy against a state," such that even a state's express waiver of sovereign immunity cannot render it amenable to suit under Section 1983.[6] *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69, 117 S. Ct. 1055, 1070 (1997); *see also Machete Prods., LLC v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) (explaining that state cannot be sued under § 1983 for monetary relief even if it waives its sovereign immunity). Accordingly, Plaintiffs may not pursue money damages against Corcoran, Miller and Moyer in their official capacities.

Plaintiffs may pursue injunctive relief against Defendants under Section 1983, however. In *Will*, the Supreme Court explained that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the state.'" 491 U.S. at 58, 71 n.10, 109 S. Ct. 2304 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14, 105 S. Ct. 3099 (1985); *see also Van Story v. Washington Cty. Health Dep't*, ELH-17-3590, 2018 WL 5830740, at *6 (D. Md. Nov. 7, 2018) (recognizing this "exception to the general law."). While this case was pending, Robert L. Green became the Secretary of the Department of Public Safety and Correctional Services; therefore, Plaintiffs pursue injunctive relief against Green in his official capacity. *See* Fed. R. Civ. P. 25(d). In sum, the plaintiffs are pursuing § 1983 official capacity claims against Green for injunctive relief, and § 1983 individual capacity claims against Corcoran, Miller, and Moyer for monetary relief.

## B. Defendants are entitled to Judgment on Plaintiffs' access to courts claims.

In *Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491 (1977), the Supreme Court declared that prisoners have a constitutionally protected right to access the courts. 430 U.S. at 821, 97 S.

---

[6] For this reason, Defendants may waive their defense of sovereign immunity as to the ADA, *see infra*, but not as to Section 1983.

Ct. 1491. To preserve this right, the Supreme Court directed prison authorities to "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 829, 97 S. Ct. 1491. The Court subsequently clarified that *Bounds* did not establish a freestanding right to a law library or legal assistance. *Lewis v. Casey*, 518 U.S. 343, 350, 116 S. Ct. 2174 (1996). As this Court recently noted, *Bounds* does not grant prisoners the "wherewithal to transform themselves into litigating engines" pursuing any conceivable legal claim. *Moise v. Howard Cty Det. Ctr.*, RDB-18-1355, 2019 WL 454101, at *5 (D. Md. Feb. 4, 2019) (quoting *Lewis v. Casey*, 518 U.S. 343, 355, 116 S. Ct. 2174 (1996)). Rather, prisoners' constitutional rights are protected so long as they are afforded a "reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement." *Lewis*, 518 U.S. at 355, 116 S. Ct. 2174 (citations omitted).

To prevail on access to courts claims, Plaintiffs must demonstrate that they have suffered an "actual injury" hindering their ability to bring legal challenges. *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 356, 116 S. Ct. 2174). Because prisoners do not possess an "abstract, free-standing right to a law library or legal assistance," this Court has previously held that they cannot prevail by identifying a "theoretical" defect in the prison's library or legal assistance program. *Pearson v. Simms*, 345 F. Supp. 2d 515, 519 (D. Md. 2003) (quoting *Lewis*, 518 U.S. at 351, 116 S. Ct. 2174). Simply proving that "an institution's library is inadequate or access to that library is restricted" will not suffice. *Strickler v. Waters*, 989 F.2d 1375, 1385 (4th Cir. 1993). Rather, Plaintiffs must demonstrate that their

"nonfrivolous" legal claims have been "frustrated" or "impeded." *Lewis*, 518 U.S. at 353, 116 S. Ct. 2174.

To establish liability under 42 U.S.C. § 1983, plaintiffs must show that the defendants "acted personally" to cause the alleged violation. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (citation omitted). Under *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994) supervisory liability may attach under § 1983 if a plaintiff can establish three elements: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. 13 F.3d at 799 (citations omitted). Plaintiffs may meet their "heavy burden of proof" to show that Defendants acted with deliberate indifference by "demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" *Shaw*, 13 F.3d at 799 (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984). Plaintiffs cannot rely on "pointing to a single incident or isolated incidents." *Slakan*, 737 F.2d at 373.

1. **Plaintiffs have not adduced sufficient evidence to raise a genuine dispute of material fact as to Defendants' liability.**

Plaintiffs cannot show that Corcoran, Miller, and Moyer are liable for any purported denial of court access. In this case, nearly all the alleged incidents Plaintiffs invoke to support their access-to-courts claim occurred before the Defendants were on the job. Moyer became Secretary in 2015; Corcoran was Commissioner from 2016 until 2018; and Miller was the Warden at RCI from April 2015 until November 2017. No jury may conclude that these

Defendants were "personally involved" in actions which took place before they had any supervisory authority over RCI. Instead, Plaintiffs are tasked with holding these Defendants liable for the very few purported constitutional violations occurring during their tenure.

Plaintiffs argue that Defendants "bur[ied] their heads in the sand" while overseeing RCI and ignored clear indications that Plaintiffs were being deprived of their access to the courts. *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). For this proposition, they rely in part on Defendants' "knowledge of the present lawsuit" and a civil Complaint Wilson filed in May 2016, alleging that he was "partially blind and crippled, and has no help from the Institution to access the law books." (Pl.'s Resp. 37, ECF No. 182; Ex. 34, WILSON 403-11.) Plaintiffs do not cite authority holding that knowledge may be imputed from the allegations in a Complaint. Moreover, this Court is mindful that both the Amended Complaint in this suit and Wilson's filing neglects to cite even a single specific instance in which Plaintiffs were denied access to the courts. *Cf. Voutour v. Vitale*, 761 F.2d 812, 820 (1st Cir. 1985) (finding no supervisory liability despite police chief's knowledge of complaints of police brutality). Defendants cannot be charged with the knowledge of constitutional violations merely because Plaintiffs filed lawsuits containing vague allegations. As Plaintiffs wholly rely on the existence of this lawsuit to impute knowledge to Secretary Moyer, he cannot be held liable for these claims.

Additionally, Plaintiffs cite a handful of purported red flags which they conclude put Defendants Corcoran and Miller on notice of their claims. They note that soon after Miller became the warden of RCI, Holley sent him a 2012 decision issued by the Inmate Grievance Office ("IGO") which found that "RCI was not providing . . . library services for the sight

impaired." (Pl.'s Resp. Ex. 1, Miller Dep. 95:8-96:1, 157:5-158:5; PSJ Ex. I-17, at S HOLLEY 10.) Miller considered taking remedial action by purchasing Dragon transcription software, but ultimately did not see the purchase through before leaving RCI. (Pl.'s Resp. Ex. 1, 49:7-53:17.) In December 2017, Corcoran participated in discussions and a demonstration of auxiliary aids. (Pls.' Resp. Ex. 13, Corcoran Dep. 63:1-64:6; Ex. 39, Stanford Dep. 14:6-15:10.) Defendants also cite ARPs filed in 2016 by Snead. In one ARP appeal, he complained that blind inmates could not obtain staff assistance with filing ARPs. (PSJ Ex. G-110, at SNEAD 1196-99, 1202-05, 1207-09.) In another, Snead claimed that he had sent several letters to the Warden complaining that his case manager would not arrange private telephone calls with his attorneys and that he could not communicate with them in writing, fearing that recruiting the help of other inmates to do so would jeopardize his attorney-client privilege. (Pls.' Resp. Ex. 40, SNEAD 81-82.) Miller and Corcoran dismissed the first ARP appeal. Plaintiffs argue that a jury may infer that the latter was also brought to their attention based on the deposition testimony of a corporate designee, Maureen Reid, who indicated that staff members would know to advance disability-related requests to their supervisors. (PSJ Ex. E, Reid 30(b)(6) Dep. 85:18-21.)

One IGO finding and two ARPs submitted over the course of two years are not sufficient to infer that Miller and Corcoran had actual knowledge that their subordinates were placing plaintiffs in a pervasive and unreasonable risk of constitutional injury. This evidence falls far short of the "longstanding, pervasive, well-documented, or expressly noted" rights violations contemplated by the Fourth Circuit. Furthermore, neither the IGO nor the ARPs cited by Plaintiffs conclude or allege that blind inmates were unable to file lawsuits. *Cf. Hall v.*

*Stouffer*, 2018 WL 4599646, at *14-15 (finding genuine dispute of fact as to supervisory liability where plaintiff wrote correspondence to Defendant complaining that he was being "totally deprived" of his access to the courts and had no relevant legal materials and legal assistance at his disposal). At best, Miller and Corcoran knew that the library lacked certain auxiliary aids and that one inmate, Snead, complained of trouble pursuing grievances and consulting with his attorney. There is no evidence that Miller and Corcoran buried their heads in the sand while plaintiffs were shut out of court. Accordingly, Defendants Corcoran, Miller, and Moyer may not be held liable. They are entitled to Judgment as a matter of law.

### 2. Plaintiffs have not adduced evidence of actual injuries.

Even if Defendants could be held liable, they would be entitled to Judgment in their favor because there is no evidence that Plaintiffs suffered an actual injury. To adequately demonstrate an "actual injury" for purposes of summary judgment, plaintiffs must show that the underlying claim is "nonfrivolous," that is, at least "arguable" and based on "more than hope." *Christopher v. Harbury*, 536 U.S. 403, 416, 122 S. Ct. 2179 (2002). To meet this burden Plaintiffs must at least identify the nature of the underlying claim and produce competent evidence of its existence. *See James v. Cotter*, CV9:14-4518-TLW-BM, 2017 WL 7054157, at *6 (D.S.C. Sept. 19, 2017), *report and recommendation adopted*, 9:14-CV-4518-TLW, 2018 WL 573157 (D.S.C. Jan. 26, 2018) (granting summary judgment because plaintiff failed to adduce docketing information or any probative evidence to show that he was prejudiced by the loss of legal papers).

Wilson, Holley, Hammond, and Polley have conceded that they cannot identify a single instance in which they were denied access to the courts. In response to an interrogatory asking

them to "identify each occasion on which you claim that because of your blindness you were denied access to court," these plaintiffs either admitted that their claims were baseless or did not answer the question. Wilson answered that he made "no such allegations" at the time. (DSJ Ex. 17, Wilson Supp. Answers to Interrog. No. 7.) Holley complained that he lacked accommodations "allowing him to perform his own legal research" but that "[h]e was able to retain an attorney." (DSJ Ex. 18, Holley Supp. Answers to Interrog. No. 7) Hammond explained that he paid another inmate to assist him with motions for post-conviction relief and that he "prevailed in his request for relief." (DSJ Ex. 19, Hammond Supp. Answers to Interrog. No. 7.) Polley answered that, aside from being able to use an accessible computer at the library to conduct his own legal research, he "was not otherwise denied access to court." (DSJ Ex. 20, Polley Supp. Answers to Interrog. No. 7) The evidence does not otherwise suggest that these four plaintiffs were impeded from bringing legal challenges.

Other Plaintiffs responded to this interrogatory with numerous claims falling outside of the relevant statutory period. "The statute of limitations for § 1983 claims is borrowed from the applicable state's statute of limitations for personal-injury actions, even when a plaintiff's particular § 1983 claim does not involve personal injury." *Tommy Davis Const., Inc. v. Cape Fear Pub. Util. Auth.*, 807 F.3d 62, 66-67 (4th Cir. 2015) (citing *Wilson v. Garcia*, 471 U.S. 261, 275-80 (1985)). In Maryland, the applicable statute of limitations is three years from the date of the occurrence giving rise to the cause of action. *See* Md. Cts & Jud. Proc. Code Ann. § 5-101. Accordingly, Plaintiffs have properly conceded that they cannot seek damages arising from (1) Delano's claimed difficulties in 2007 and 2008 to modify or reduce his sentence; (2) Snead's claim that he missed deadlines related to a federal habeas petition and post-conviction

appeal in 2002; and (3) Brown's missed filing deadlines for his appeal in 2008 and his purported inability to obtain legal assistance to seek collateral review in 2009. (Pls.' Resp. 27, ECF No. 182.)

Finally, the remaining Plaintiffs base their claims upon vague assertions of missed deadlines and unfiled papers, but do not explain why their underlying claims had any merit or present evidence to support them. *See, e.g.*, DSJ Ex. 22, Hopkins Supp. Answers to Interrog. No. 7 (Claiming that he was ""denied access to the courts because of his blindness in or around late 2016 or early 2017, when he could not find any inmates whom he trusted to assist him to file a motion with the Maryland district court in Towson to have his sentence reduced.")

Plaintiffs argue that "injury may be presumed where a total denial of access to a law library or legal assistance is alleged." *Strickler v. Waters*, 989 F.2d 1375, 1385 n.16 (4th Cir. 1993) (collecting cases); *see also DeMallory v. Cullen*, 855 F.2d 442, 449 (7th Cir. 1988); *Harris v. Young*, 718 F.2d 620, 622 (4th Cir. 1983). These cases pre-date the actual injury requirement articulated in *Lewis*, decided in 1996, and this Court has properly characterized the relevant quotation from *Strickler* as "dicta." *Hall v. Stouffer*, GLR-15-1008, 2018 WL 4599646, at *14 (D. Md. Sept. 25, 2018). This case does not resemble the extreme deprivations at issue in *Hall*, on which plaintiffs pin their hopes. 2018 WL 4599646 (D. Md. Sept. 25, 2018) (presuming prejudice in light of evidence that Plaintiff, sentenced in Maryland but incarcerated in Virginia, had no access to any Maryland legal materials or legal assistance).

The record reveals that Plaintiffs do not suffer from a "total denial of access" to the courts. The very fact that they have been able to challenge the conditions of their confinement from within RCI reveals that they have access to the court system while confined in this

institution. *See Robles v. Kane*, 550 F. App'x 784, 787 (11th Cir. 2013) ("[T]he fact that Robles' complaints are now before this Court is proof that the Facility did not interfere with his freedom to invoke the judicial process."); *Bridges v. Gilbert*, 557 F.3d 541, 555 (7th Cir. 2009) (rejecting access-to-courts claims after noting that plaintiff was "currently exercising his right to petition the government for redress of grievances through this lawsuit."); *Hornsby v. Jones*, 188 F. App'x 684, 690 (10th Cir. 2006) (rejecting plaintiff's claim that failure to provide adequate legal materials amounted to a violation of his constitutional rights because he was able to invoke the judicial process while incarcerated); *Romansky v. Stickman*, 147 F. App'x 310, 312 (3d Cir. 2005) ("Romansky's access to the District Court satisfies his right to petition the government."). Additionally, there is substantial evidence in the record of Plaintiffs filing claims and consulting with attorneys. For example, Brown received legal assistance from Karen Polic, a lawyer from the Collateral Review Division of the public defender's office, to assist his efforts to enter the "8-505" drug program and to successfully pursue a significant reduction in the length of his sentence. (DSJ Ex. 28, Brown's Answers Interrog No. 7.)

As Plaintiffs have failed to raise evidence of actual injury and this Court cannot presume that they suffered one, there is no genuine issue of material fact to present to a jury.

### 3. The right to access the courts does not encompass filing grievances and obtaining a divorce.

Unable to produce competent evidence that Defendants have stymied their efforts to challenge their sentences or conditions of confinement, Plaintiffs argue that their troubles obtaining access to RCI's grievance procedures deprives them of their constitutional right to access the courts. The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, requires prisoners to exhaust their administrative remedies before pursuing claims in Court. § 1997e(a).

Accordingly, Plaintiffs argue, their denial of access to ARP proceedings prevents them from filing court complaints. To support this claim, Plaintiffs have produced evidence that the ARP process at RCI requires the use of a print form that is not available in large print or any other accessible format. (PSJ Ex. E, Reid 30(b)(6) Dep. 201:11-16; PSJ Ex. Q, Smart Dep. 132:6-8.) Appeals of ARP forms, made through the Inmate Grievance Office ("IGO"), must also be submitted through standard print forms. (PSJ Ex. C, Campbell 30(b)(6) Dep. 128:1-21.) There is evidence that Plaintiffs were unable to file grievances or faced difficulties finding assistance to file them.

This argument fails because the constitution does not confer a right "to participate in grievance proceedings." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994); *see also Booker v. South Carolina Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017) ("[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure."). The plaintiffs purported exclusion from the grievance process does not give rise to a constitutional claim. Moreover, Plaintiffs' alleged inability to access inmate grievance procedures would not foreclose their access to the courts. As the Supreme Court explained in *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016), an inmate need only "exhaust available remedies, but need not exhaust unavailable ones." (quoting §1997e(a)). Accordingly, Plaintiffs need only pursue administrative proceedings which are "capable of use." *Id.* Under the PLRA, Plaintiffs may forego ordinary exhaustion requirements by demonstrating that they were unable to read the print-only grievance materials or that they otherwise had no ability to use the grievance procedures. Accordingly, even assuming that Defendants deprived Plaintiffs of access to

grievance procedures, this deprivation did not foreclose their access to the courts and does not amount to a constitutional violation.

Finally, prisoners' constitutional right of access to the courts does not encompass James's claim that he was unable to obtain a divorce, resulting in his "remain[ing] legally married against his wishes." (DSJ Ex. 21, Pls.' Ans. Defs.' Interrog. No. 7.) In *Lewis*, the Supreme Court clearly specified that prison officials must make available to prisoners the tools necessary to "attack their sentences, directly or collaterally, and . . . to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." 518 U.S. at 356, 135 S. Ct. 2174. This limiting language clearly proscribes claims based on plaintiffs' pursuit of legal matters which do not touch upon the prisoners' confinement, including claims arising from the inability to prosecute divorce proceedings. *See, e.g.*, *Wagner v. Gober*, No. 4:15-CV-1789 CAS, 2017 WL 2984841, at *4 (E.D. Mo. July 13, 2017) ("Numerous cases have held that the constitutional right of access to the courts does not extend to litigation involving divorce cases.") (collecting cases).

As the Sixth and Seventh Circuits have recognized, another line of Supreme Court cases holds that the First Amendment "includes the right to file other civil actions in court that have a reasonable basis in law or fact." *Snyder v. Nolen*, 380 F.3d 279, 290 (7th Cir. 2004) (collecting cases); *John L. v. Adams*, 969 F.2d 228 (6th Cir. 1992). Harmonizing these authorities with *Lewis*, the Sixth and Seventh Circuits have concluded that in civil actions unrelated to their incarceration, prisoners enjoy a First Amendment right to petition the courts free from state-imposed "barriers" or "undue interference." *Snyder*, 380 F.3d at 291; *John L.*,

969 F.2d at 235. Accepting this persuasive authority, the record reveals that James does not have a claim. He does not maintain that his divorce was stymied by an affirmative action taken by the Defendants; rather, it is their failure to provide him with auxiliary aids and services which he finds constitutionally infirm. No binding precedent compels this Court to accept this theory, and the language in *Lewis* expressly forecloses such a claim. Accordingly, Summary Judgment IS ENTERED in favor of Defendants on James' denial-of-access claims.

## C. Eighth Amendment Violations (Count II)

In Count II, Plaintiffs accuse Defendants Corcoran, Miller, and Moyer of subjecting them to cruel and unusual punishment in violation of the Eighth Amendment. Plaintiffs claim that Defendants' decision to place them in a cell with another inmate (a practice the parties refer to as "double-celling") without considering their blindness constitutes cruel and unusual punishment. (Am. Compl. ¶ 92, ECF No. 23.) Plaintiffs additionally claim that the Defendants failure to "reasonably modify their policies or procedures" or "to supply auxiliary aids or services" forced them to rely on other inmates for assistance, placing them at risk of abuse and extortion by other inmates. (Am. Compl. ¶¶ 92-93, ECF No. 23.) Defendants move for Summary Judgment on these claims.

The Eighth Amendment charges prison officials with "certain basic duties." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016). To fulfill their Eighth Amendment obligations, officials must ensure "humane conditions of confinement" and implement "reasonable measures to guarantee the safety of the inmates." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970 (1994). Because "being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society," prison officials "have

'a duty to protect prisoners from violence at the hands of other prisoners.'" *Id.* (quoting *Farmer*, 511 U.S. at 832, 834). "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety," however. *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 834, 114 S. Ct. 1970). For liability to attach, plaintiffs must satisfy a two-part test containing objective and subjective elements. *Makdessi*, 789 F.3d at 133.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or the substantial risk thereof. *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014). To establish liability arising from a failure to protect claim, the plaintiff must demonstrate that he was "incarcerated under conditions posing a substantial risk of serious harm." *Makdessi*, 789 F.3d at 133. The risk must be of such a kind that society deems it "so grave that it violates contemporary standards of decency." *Raynor*, 817 F.3d at 127 (quoting *Helling v. McKinney*, 509 U.S. 25, 36, 113 S. Ct. 2475 (1993)).

The plaintiff need not always adduce evidence that he suffered an extreme physical injury—evidence which tends to establish a "substantial risk" of one may suffice. For example, prison conditions may be so vile and pestilence plagued that injury is almost certain to manifest. An inmate enduring such conditions need not await his near-certain assault or sickness before filing suit. *See Helling v. McKinney*, 509 U.S. 25, 33-34, 113 S. Ct. 2475 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."); *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011) (finding allegation that "severe overcrowding was causing unsanitary conditions, the spread of disease, an increased risk of

violence, and lack of access to medical care" was sufficient to survive a motion to dismiss despite plaintiff's failure to allege that he suffered any physical ailments arising from these conditions). A plaintiff may also survive summary judgment by demonstrating that he suffered a minor injury, so long as it evidences a grave risk of more serious harm. *Thomas v. Younce*, 604 F. App'x 325, 326 (4th Cir. 2015) (holding that plaintiff's knee injury, resulting from his fall down a flight of stairs, constituted evidence that plaintiff faced a substantial risk of more serious injury). Moreover, a plaintiff may aid his case by demonstrating that certain facts peculiar to him elevated his risk of serious harm to an excessive degree. *See Makdessi*, 789 F.3d at 134 ("[I]t does not matter whether . . . a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." (quoting *Farmer*, 511 U.S. at 834, 114 S. Ct. 1970)).

The subjective component requires an inmate to demonstrate "that the prison official had a 'sufficiently culpable state of mind,' which . . . consists of 'deliberate indifference to inmate health or safety.'" *Raynor*, 817 F.3d at 127 (quoting *Farmer*, 511 U.S. at 834, 114 S. Ct. 1970). The plaintiff must prove that the official had actual knowledge of an excessive risk of serious harm, or that she was aware of facts from which she could draw the inference that a substantial risk of serious harm existed, and in fact did draw that inference. *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970. This knowledge may be proved "in the usual ways, including inference from circumstantial evidence." *Raynor*, 817 F.3d at 128 (citation omitted).

### 1. Double-Celling

Double-celling inmates is not *per se* unconstitutional. *Rhodes v. Chapman*, 452 U.S. 337, 101 S. Ct. 2392 (1981) (holding that district court's factual findings cut against its conclusion

that double-celling amounted to cruel and unusual punishment); *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991) ("It is clear that double or triple celling of inmates is not *per se* unconstitutional.") Inmates may nonetheless challenge their celling arrangement by contending that it puts them at a unique risk of serious harm, and that Defendants were deliberately indifferent to this special risk. *See Thomas*, 604 F. App'x at 326 (holding that prisoner could pursue an Eighth Amendment claim based on his twice refused request for a medically necessary special bunk assignment); *cf. Williams v. Bishop*, RWT-12-1616, 2014 WL 4662427, at *6 (D. Md. Sept. 17, 2014) (dismissing plaintiff's claim that he was entitled to a single cell because he relied only on his "belief that his medical conditions cause difficulties with cellmates" for support).

To withstand Summary Judgment, Plaintiffs must present evidence raising a genuine dispute of material fact concerning whether Defendants possessed a "sufficiently culpable state of mind," *i.e.*, that they were deliberately indifferent to the inmate's health and safety. *Makdessi*, 789 F.3d at 133. The Defendants must have "subjectively recognized" both that a "substantial risk of harm existed" and that their actions were "inappropriate in light of that risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (citing *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)). Plaintiffs may satisfy this burden by submitting evidence warranting the conclusion that the risk of injury was "so obvious that . . . the officer *did* know if it because he could not have failed to know of it." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). Alternatively, the Plaintiff may also show "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had

been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish*, 372 F.3d at 303 (quoting *Farmer*, 511 U.S. at 842, 114 S. Ct. 1970 (1994)).

To show that Warden Miller knew that double-celling posed a substantial risk of serious injury, Plaintiffs rely primarily on two emails sent to Miller from Todd Faith and Lieutenant Michael Franklin. (PSJ Ex. 76.) On February 9, 2016 Franklin asked Miller with assistance housing blind inmates, complaining that RCI only had "9 cells that were designated to house them and we currently have 16 visually impaired inmates in the unit . . . ." (*Id.*) Later that day, Todd Faith forwarded an email to Miller which he had previously sent to Lt. Necole Haggie. In that email, Faith stated that "I believe we are going in a unsafe direction with ADA and [Prison Rape Elimination Act "PREA"] laws if [double-celling blind inmates] isn't corrected soon." (*Id.*) In response, Miller admitted that "assigning a cell partner to a blind inmate could prove counterproductive," and stated that "the level of cooperation in the cell between inmates, one of which is blind, will have to offer a higher degree of respect and higher levels of compromise." (*Id.*) It is not possible for a jury to infer that Miller was aware of a substantial risk of serious injury facing blind inmates based on his comments in this email exchange. The exchange does not reveal that Miller was personally aware of any real incidents of misconduct involving double-celled blind inmates (neither Lt. Franklin nor Lt. Haggie reported anything of the sort) and Miller's mild concern that double-celling blind inmates could be "counterproductive" does not suggest that he believed blind inmates were in any real danger. Nor should he have been; as discussed below, the record in fact reveals that serious altercations between blind inmates and their cellmates were few and far between.

Plaintiffs would offer even less evidence for the jury to conclude that Corcoran possessed the requisite knowledge. Citing to her deposition, Plaintiffs complain that Corcoran ordered double-celling of blind inmates without making individualized inquiries into the risks associated with this arrangement. (Pl.'s Resp. Ex. 13, Corcoran Dep. 214:2-217:5.) The deposition testimony cited, however, does not indicate that Corcoran ordered double-celling. Citing to the exact same email exchange referenced in the preceding paragraph as well as deposition testimony from Denise A. Gelsinger, Plaintiffs baldly claim that "DOC never responded" to RCI officials' requests to single-cell blind inmates. To be clear, Corcoran was not copied on the emails by Franklin and Faith, and there is no evidence that she was aware of any instances of harm inflicted on blind inmates as a result of their double-celling. Because there is not a whiff of evidence that Corcoran had any knowledge of the supposed risk that Plaintiffs complain of, she cannot be held liable.

Plaintiffs come close to acknowledging that they cannot impose liability on Moyer. Instead, they claim that "Plaintiffs' lawsuit put him on notice of [the double-celling] issue as of at least March 2016." (Pls.' Resp. 36, ECF No. 182.) Plaintiffs also fault him for failing to issue policies or guidance to prevent blind inmates from being inappropriately double-celled. (*Id.*) As the record is devoid of any evidence establishing that Moyer had actual knowledge (as opposed to constructive knowledge imputed by the Plaintiffs' filing of a civil action), he cannot be held liable for the offenses about which Plaintiffs complain.

Plaintiffs have also failed to put forth sufficient evidence to suggest that their periodic placement in double-cells put them at a substantial risk of harm or that they were "particularly vulnerable to abuse from their cellmates." (Pl.'s Resp. 12, ECF No. 182.) They admit that

Holley and Snead never had a cellmate and that James was not double-celled at RCI. Accordingly, these two cannot submit to the jury any constitutional claim arising from double-celling. As discussed in greater detail below, two of the remaining Plaintiffs suffered absolutely no injuries at the hands of cellmates. Another Plaintiff complains only that his cellmates were able to steal from him. Four Plaintiffs complain that they were involved in isolated altercations with a cellmate, and three of these did not suffered physical injuries. The evidence is not such as would permit a jury to find that a risk was *substantial* or that they faced potentially *serious* injury. Putting it simply: if double-celling were unconstitutional in this case, where there is only evidence of the rare altercation resulting in little or no harm, then double-celling would be unconstitutional in all cases.

There is no evidence that either James, Brown or Hopkins suffered serious injuries because of their double-celling. Brown testified that he was briefly double-celled for a few months in 2013 but was otherwise single-celled in accordance with a medical order. (Def.'s Reply Ex. 2, Brown Dep. 25:11-26:7, 28:12-14.) There is no evidence that any harm, even *de minimis* harm, came to Brown because he was double-celled. When James was first arrested in 2013, he was briefly double-celled at the Department's Maryland Reception, Diagnostic and Classification Center ("MRDCC"), where inmates stole from him. (DSJ Ex. 6, James Dep. 117:12-20.) Hopkins also represented that cellmates stole from him, and during his deposition he testified that cellmates "went in my commissary, stuff like that." (PSJ Ex. 3, Hopkins Interrog. No. 2, ¶ 2; DSJ Ex. 5, Hopkins Dep. 117:13-118:1.) There is no evidence that Brown, James or Hopkins suffered any physical injuries at the hands of cellmates, and the mere theft of property cannot amount to a constitutional violation. *See Hunter v. Sherman*, 49 F. App'x

611 (6th Cir. 2002) (holding that the deliberate indifference to the security of his property is not cognizable under the Eighth Amendment); *Wa-Gino v. Arizona Dep't of Corrs.*, 94 F.3d 654 (9th Cir. 1996) (same). Accordingly, neither Brown, James or Hopkins can claim that their double-celling amounted to a constitutional deprivation; nor can they show that Defendants were deliberately indifferent to a substantial risk of harm arising from their placement in double-cells.

While two of the Plaintiffs complain of altercations with other cellmates, neither suffered injuries which would suggest that they were in serious danger. One testified that his cellmate poked his forehead, so he threw a punch. (DSJ Ex. 7, 17:15-19:19.) The poke did not harm him, and the two did not fight again. (*Id.* at 20:6-11, 40:11-41:12.) Another testified that "a couple times" a cellmate "physically grabbed [him] on [his] chest" and that he was assaulted on other occasions but did not report these assaults. (DSJ Ex. 9 23:7-25:4, 26:9-27:11.) It is undisputed that the chest-grabbing incident did not result in any physical injuries and there are no details concerning the other incidents of assault. There is no evidence that either Plantiff experienced anything beyond the ordinary jailhouse scuffle in which nearly every inmate is involved, unfortunately, at some point or another. There is certainly no evidence that Defendants were aware of, but disregarded, any substantial risk of serious harm faced by these inmates.

Another Plaintiff, while double-celled with several inmates over time, was only ever attacked by one. (DSJ Ex. 3, 16:8-12, 17:21-19:10, 21:12-17, 67:17-68:10.) Angered that he had lost his preferred job as an inmate escort, the cellmate punched, slapped, and choked the Plaintiff over a period of three weeks, causing bruising on his stomach, chest, ribs, and arms.

(*Id.* at 18:11-18.) Prison officials relocated the cellmate about two weeks after he reported the incidents. (*Id.* at 20:3-8.) His second cellmate did not injure him. (*Id.* at 69:14-15; 72:11-12; 74:20-75:5.) As prison officials separated this inmate from his attacker soon after the altercation, and his continued double-celling was without incident, it cannot be said that Defendants disregarded a substantial risk of harm facing him.

Finally, one Plaintiff claims that he "got into three arguments" with his cellmate when he was double celled for approximately one month in December 2014 or the beginning of 2015. (Pl.'s Resp. Ex. 2, Ans. Interrog. No. 4 ¶ 4.) Arguments do not amount to cruel and unusual punishment. He also claims, however, that in or around 2011, his cellmate attempted to rape him while he was sleeping. (*Id.*; DSJ Ex. 2, 56:3-7, 56:17-57:2.) Plaintiffs acknowledge that this event falls outside of the statutory period, but maintain that it is relevant to show that he faced a substantial risk of serious harm while double-celled. This single incident cannot give rise to the inference that he faced a substantial risk of serious injury in any future double-celling arrangement with other cellmates. The cellmate posed no threat to him after his transfer from ECI. There is no indication that the Defendants knew of this Plaintiff's encounter with his cellmate, an event which occurred at a different prison, and before they were hired to oversee RCI. Even if they were aware of this single incident, the mere fact that he faced danger at the hands of one cellmate in the past does not suggest that any double-celling arrangement placed him in substantial risk of serious injury from other cellmates.

Plaintiffs' evidence cannot demonstrate that they were in a worse a position than the scores of other inmates currently housed in double-cells today. Of the nine Plaintiffs before this Court, only three complain of physical altercations with fellow inmates, and no such

altercation within the limitations period resulted in serious injury. With so little evidence of serious injury suffered by any of these nine Plaintiffs despite a voluminous factual record probing several years of incarceration, there can be no genuine issue of material fact concerning whether these Plaintiffs faced a "substantial" risk of injury or whether Defendants were deliberately indifferent to such risk.

In sum, the record contains insufficient evidence to establish that Plaintiffs faced a special, magnified risk of harm resulting from double-celling and, critically, that the Defendants they have chosen to sue apprehended such risk. To permit Plaintiffs to submit such a flimsy record to the jury invites liability for *any* double-celling arrangement. Such holding would counsel prison officials to house blind inmates in single-cells no matter the circumstances, thereby depriving inmates from a potentially valuable cellmate relationship simply because they are blind. This is simply not constitutionally mandated. Accordingly, Summary Judgment IS ENTERED in favor of Defendants on Plaintiffs' claim that their double-celling violated the Constitution.

### 2. Dependence on Other Inmates.

Plaintiffs cannot establish that their dependence on other inmates for reading and writing and navigating prison facilities created a significant risk of serious injury. Once again, there is no evidence that any of the named Defendants were privy to the substantial risk Plaintiffs allege. While Miller acknowledged, in the abstract, that putting inmates under the control of others "could create violence, extortion" (PSJ Ex. 1, Miller Dep. 64:4-21, 66:5-17), this nebulous assertion is far from an admission that Miller understood plaintiffs to be in the control of others or that he thought that any particular plaintiff was in serious danger.

Moreover, there is unrefuted testimony that Miller had reviewed RCI's provision of assistive devices to the visually impaired and that he believed these services were adequate. (Pls.' Resp. Ex. 1, Miller Dep. 96:3-10.)

To foist liability upon Corcoran, Plaintiffs pursue a similar tack. They note that Corcoran answered in the affirmative when asked whether guidance in the Inmate Handbook was "in tension" with the proposition that inmates are not able "to choose who they rely on to read or write or travel or to help them." (Corcoran Dep. 219:13-220:8.) Plaintiffs also claim, based on a fair reading of deposition testimony, that Corcoran "understood that having one inmate supervise, direct, or control another inmate could lead to conflict, violence and extortion." (*Id.* at 104:3-13.) Plaintiffs assert that these abstract assertions, coupled with Corcoran's general knowledge of the walker program and blind inmates' reliance on other inmates for reading and writing, provide sufficient evidence for a jury to conclude that she was deliberately indifferent to a substantial risk of serious injury. These snippets of deposition testimony are plainly insufficient to raise a genuine dispute of material fact on this record, which is utterly devoid of any evidence that Corcoran was aware that a single Plaintiff was in peril. At best, Plaintiffs' evidence could support the conclusion that Corcoran was aware of *some* risk to the general body of blind inmates, but there is no evidence that Corcoran believed this risk to be especially pronounced or that *these* Plaintiffs faced a higher degree of danger than the average inmate, confined at any institution.

Finally, and once again, Plaintiffs cannot establish that Moyer—sitting at the highest reaches of the Department—had any awareness of a substantial risk of injury facing a miniscule subset of the prison population he oversaw. Plaintiffs even acknowledge that Moyer

believed that, at RCI, Plaintiffs had access to "equipment . . . to assist them." (Moyer Dep. 83:19-84:1.) There is simply no evidence that Moyer possessed the requisite *mens rea* to hold him liable for a constitutional violation.

Plaintiffs have additionally failed to produce evidence that abuse at the hands of a walker or other inmate assistants was "widespread." For many of the Plaintiffs, there is not a shred of evidence that their visual impairments rendered them predisposed to assault from other inmates. Brown did not complain that the inmate escorts he relied upon caused him harm (Brown Dep. 42:5-44:6). While James claimed that he was grabbed by a walker and kicked by another, both of these walkers were replaced soon after he requested new ones and he suffered no injuries from these incidents (James Dep. 75:21-79:22, 106:7-9, 121:16-124:19.) The only injury Polley sustained at RCI occurred when he bumped his head, for which he was provided Motrin and an ice pack. (Polley Dep. 38:14-40:10). Aside from isolated incidents involving cellmates, neither Wilson nor Hammond were ever assaulted or injured by any other inmates. (Wilson Dep. 23:7-25:4, 26:9-27:11; Hammond Dep. 69:14-15, 72:11-12, 74:20-75:5.)

Plaintiffs have failed to establish that all but a few of their number suffered any injuries based on their reliance on others for various forms of assistance. There is no evidence that the individual Defendants were aware of the scattered incidents of violence affecting these Plaintiffs. Without such evidence, Plaintiffs cannot submit this claim to a jury. Accordingly, Summary Judgment IS ENTERED in favor of Defendants on Plaintiffs' claim that their general reliance on other inmates resulted in constitutional violations.

**D. Defendants are entitled to qualified immunity.**

Defendants assert qualified immunity as a defense to Plaintiff's constitutional claims. "To establish a qualified immunity defense, a public official must demonstrate that (1) a plaintiff has not alleged or shown facts that make out a violation of a constitutional right, or that (2) the right at issue was not clearly established at the time of its alleged violation." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 395-96 (4th Cir. 2014) (internal quotations omitted). In this case, Plaintiffs have failed to adduce sufficient evidence to support their constitutional claims. There is no evidence that they were unable to pursue a specific, non-frivolous legal claim in violation of their right to access the courts. As to their cruel and unusual punishment claims, there is no evidence that Defendants were deliberately indifferent to a substantial risk of harm facing the Plaintiffs. Deliberate indifference is a critical element of a failure to protect claim; it is not merely a means of attributing liability to a Defendant. *See Farmer v. Brennan*, 511 U.S. 825, 835, 114 S. Ct. 1970 (1994) (explaining that the "deliberate indifference" requirement 'follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" (quoting *Wilson*, 501 U.S. 294, 297, 111 S. Ct. 2321 (1991))). Having failed to meet their evidentiary burden on this element, Plaintiffs cannot establish an Eighth Amendment violation. Furthermore, because plaintiffs have identified only scattered incidents of ill-documented injuries, and some plaintiffs suffered no serious injuries whatsoever, they have failed to raise a genuine dispute of material fact as to their constitutional violations. As "the relevant facts do not make out a constitutional violation at all," Defendants are entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808 (2009). Accordingly, Summary Judgment IS ENTERED in favor of Defendants on Counts I and II.

## II.    Violations of the ADA and the Rehabilitation Act.

Plaintiffs have moved for partial Summary Judgment on their Americans with Disabilities Act claims (Count III) and claims under Section 504 of the Rehabilitation Act (Count IV).  Both Title II of the ADA and Section 504 prohibit discrimination against people with disabilities.  Title II of the ADA states that "no qualified individual with a disability shall by reason of such disability be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Similarly, Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794.

These claims "can be combined for analytical purposes because the analysis is substantially the same." *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) (quotations and citations omitted).  Both statutes "share the same definitions of disability." *Rogers v. Dep't of Health & Environmental Control*, 174 F.3d 431, 433 (4th Cir. 1999). Title II of the ADA explicitly provides that "[t]he remedies, procedures, and rights" provided under § 504 of the Rehabilitation Act "shall be the remedies, procedures and rights [that Title II of the ADA] provides to any person alleging discrimination on the basis of disability . . . ." 42 U.S.C. § 12133.  Although the statutes have some important differences, including a different "causative link between discrimination and the adverse action," *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999), these distinctions are not at issue in this case.

To prevail under Title II of the ADA or Section 504 of the Rehabilitation Act, "a plaintiff must show that [he] was excluded from participation in, or denied the benefits of, a program or service offered by a public entity, or subjected to discrimination by that entity." *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). Claims under Section 504 and Title II may be pursued under three distinct grounds: "(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Baltimore Cty.*, 515 F.3d 356, 362 (4th Cir. 2008). In this case, Plaintiffs allege that Defendants subjected them to disparate treatment and failed to make reasonable modifications to their prison services.[7]

## A. Proper Defendants.

The Amended Complaint asserts Counts III and IV against both the Department and Moyer, the former of Secretary of the Department, who is sued in his individual capacity, and Defendant Robert L. Green, the new Secretary of the Department, who is sued in his official capacity. (Am. Compl. ¶ 23.)    Neither Title II of the ADA nor Section 504 of the Rehabilitation Act permit individual capacity suits. *Barnes v. Young*, 565 F. App'x 272 (4th Cir. 2014) ("Title II of the ADA does not provide for individual capacity suits against state officials.") (internal quotation marks and citations omitted); *Badillo v. Thorpe*, 158 F. App'x 208, 211 (11th Cir. 2005) ("[T]here is no individual capacity liability under Title II of the ADA or

---

[7] Defendants would additionally require Plaintiffs to prove "actual injury," separate and apart from a violation of the ADA or the Rehabilitation Act, to prevail on their claims. *See Levy v. Mote*, 104 F. Supp. 2d 538, 541–44 (D. Md. 2000) ("The mere violation of the ADA does not alone establish injury.")   More recently, this Court has expressed uncertainty about whether plaintiffs must show that they suffered an "actual injury" distinct from enduring unfair treatment based on their disability. *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 392 (D. Md. 2011) (Hollander, J.) (explaining that there is a "lack of clarity" on this issue).   Putting aside this debate, there is sufficient evidence in the record which Plaintiffs may utilize to seek to prove that they have suffered an actual injury based on the various ways Defendants are alleged to have violated the ADA and the Rehabilitation Act.

RA."); *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) ("Neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials."). Accordingly, Plaintiffs cannot hold Moyer or his successor, Green, liable in their individual capacities under Title II of the ADA or Section 504 of the Rehabilitation Act. Remaining for adjudication are Plaintiffs' claims against the Department and official capacity claims against Defendant Robert L. Green for violations of Title II of the ADA and Section 504 of the Rehabilitation Act.

### B. Defendants have Waived their Sovereign Immunity Defense to Plaintiffs' ADA Claims.

Defendants seek Summary Judgment on Plaintiffs' ADA claims on the sole ground that they are immune to suit under Title II of the ADA. This argument only applies to Plaintiffs' ADA claims for damages, not injunctive relief. *Ex Parte Young*, 209 U.S. 123, 156 (1908). Moreover, there is no dispute that Defendants have waived any claim to sovereign immunity under Plaintiffs' identical Rehabilitation Act claims by accepting federal funding. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 496 (4th Cir. 2005).

Defendants first asserted their immunity defense to Plaintiffs' ADA claims in their Motion to Dismiss (ECF No. 100) filed on January 10, 2019, nearly three years after this case commenced on March 30, 2016 and over two years after the Amended Complaint was filed on September 7, 2016. In *United States v. Georgia*, 546 U.S. 151, 159, 126 S. Ct. 877 (2006), the Supreme Court held that the ADA abrogates state sovereign immunity for conduct that also violates the Fourteenth Amendment to the United States Constitution. 546 U.S. at 159, 126 S. Ct. 877 (2006). Neither the Supreme Court nor the Fourth Circuit have decided whether

sovereign immunity is vitiated for non-constitutional Title II claims. *Id.* (reserving this issue for the lower courts); *Spencer v. Earley*, 278 F. App'x 254, 257-48 (4th Cir. 2008) (declining to decide the extent to which Title II abrogates state sovereign immunity for claims which do not allege constitutional violations). *But see Barnes v. Young*, 565 F. App'x 272 (4th Cir. 2014) (concluding, in an unpublished *per curiam* decision with citation to *Georgia*, that Title II claims were barred because district court properly entered summary judgment against plaintiff on his § 1983 claims).

This Court need not resolve this constitutional question, because Defendants have waived their sovereign immunity defenses by waiting over two years to assert it. A Defendant may waive its defenses as a result of its "delay in asserting the defense or its course of conduct during litigation." James M. Wagstaffe, Federal Civil Procedure Before Trial § 22-IV at 22.129 (2018). The state may waive its defense of sovereign immunity. *Constantine*, 411 F.3d 474, 491 (4th Cir. 2005). A sovereign immunity defense may be waived when defendants' conduct during litigation "indicates consent to this suit and an acceptance of the federal court's jurisdiction." *Garrity v. Sununu*, 752 F.2d 727, 738 (1st Cir. 1984). The "'tactical decision'" to delay an assertion of immunity likewise results in waiver. *Barachkov v. Davis*, 580 F. App'x 288, 299 (6th Cir. Aug. 28, 2014) (quoting *In re Bliemeister*, 296 F.3d 858, 862 (9th Cir. 2002)).

Numerous federal courts of appeals have found that defendants waived sovereign immunity by participating in litigation for years without protest. *See, e.g., Cable v. Dep't of Developmental Servs. of California*, 54 F. App'x 263, 264 (9th Cir. 2002) ("actively participat[ing] in pre-trial proceedings for more than four years and wait[ing] until the eve of trial before asserting" sovereign immunity defense constituted waiver); *Hill v. Blind Indus. & Servs.*, 179

F.3d 754, 762 (9th Cir. 1999) ("appearing and litigating the merits of the controversy without objection" can amount to waiver); *Hankins v. Finnel*, 964 F.2d 853, 856-58 (8th Cir. 1992) (concluding that state waived its sovereign immunity defense by "seek[ing] to take advantage of the suit for its own benefit"); *cf. Neinast v. Texas*, 217 F.3d 275, 279 (5th Cir. 2000) (finding that state did not waive its sovereign immunity defense because district court had previously granted its motion to dismiss based on the Tax Injunction Act and it "never had occasion to contest its presence in federal court" on other grounds).

In this case, Defendants' delayed assertion of sovereign immunity must result in waiver. Defendants obtained numerous extensions to respond to Plaintiffs' Amended Complaint to permit the facilitation of settlement discussions. On December 18, 2017, this Court extended the deadline to "file a response to the complaint" to ten (10) days after referral of this matter to a Magistrate Judge for settlement discussions and either (a) "development of a schedule" or (b) "joint declaration of an impasse in developing a schedule after reasonable attempts to do so." (ECF No. 51.) On January 31, 2018 this case was referred to Magistrate Judge Stephanie A. Gallagher for settlement purposes. (ECF No. 54.) On February 27, 2018, Judge Gallagher scheduled an initial settlement conference and a follow-up settlement conference. (ECF No. 55.) Accordingly, Defendants' Motion to Dismiss was due on March 9, 2018. Defendants completely failed to meet this deadline by filing a Motion to Dismiss on January 10, 2019.

In that Motion to Dismiss, Defendants sought to dismiss the Amended Complaint on various grounds and argued, for the first time,[8] that they were immune to Plaintiff's ADA claims. At the time, the parties were constrained by a tight discovery deadline and trial date had been established. Defendants' dilatory tactics, combined with their numerous appearances before magistrate judges for settlement and discovery purposes amounts to a waiver of the State's sovereign immunity defense. Although the Defendants had not previously filed a formal pleading in this action, its activities before this Court constitute affirmative acts signaling the Defendants' consent to suit. Because Defendants conduct is plainly incompatible with an invocation of sovereign immunity, they have waived their sovereign immunity defense.

Additionally, Defendants vulnerability to suit under Section 504 of the Rehabilitation Act precludes them from asserting that defense against Plaintiffs' identical Title II claims. Plaintiffs assert the same claims under both Section 504 and Rehabilitation Act and seek the same remedies under both statutes. The parties have indicated that the slight differences between these statutes, including their distinct causation requirements, are not at issue. Accordingly, these claims are subject to identical legal analyses. Under these circumstances, it would make little sense to hold, on the one hand, that Defendants are susceptible to suit under Section 504, but, on the other hand, that they are immune to Plaintiffs' legally indistinguishable ADA claims. *See, e.g., Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 289 (5th Cir. 2005) (holding that state could not assert sovereign immunity to Plaintiffs' Title II claims because it had accepted federal funding, rendering it vulnerable to suit under Section 504, and plaintiffs' suit

---

[8] During a Motions Hearing before this Court on April 24, 2019, counsel for Defendants acknowledged that, despite lengthy settlement discussions, Defendants never informed Plaintiffs that they intended to assert this defense before filing the Motion to Dismiss.

did not implicate any distinctions between the two statutes). Under the circumstances presented here, Defendants may not evade liability under the ADA by invoking sovereign immunity.

### C. Plaintiffs have not established that they are entitled to Summary Judgment on their ADA or Rehabilitation Act claims.

Plaintiffs petition this Court to grant partial Summary Judgment and to "declare" ten items enumerated in their Motion. (ECF No. 172.) This list of items would require this Court to make certain factual findings (*e.g.*, "Defendants failed to give primary consideration to the choices of blind inmates in determining what auxiliary aids or services to provide") and make mixed rulings of fact and law (*e.g.*, "All Plaintiffs are individuals with disabilities protected by Title II and Section 504."). (*Id.*) This Court's analysis will focus on whether there are genuine issues of material fact to be resolved by a jury.

During the Motions Hearing, Plaintiffs clarified that they sought Summary Judgment on "six major claims": (1) failing to establish a process for providing auxiliary aids and other reasonable modifications or notifying Plaintiffs of their rights under Title II and Section 504; (2) denying auxiliary aids to ensure that plaintiffs' communications with Defendants, courts, and others were equally effective as those enjoyed by other inmates; (3) refusing to make reasonable modifications to ensure safe celling arrangements for blind or visually impaired inmates; (4) failing to supply training or other services to permit Plaintiffs to safely navigate department facilities, and instead requiring Plaintiffs to rely on escorts or "walkers" recruited from the prison population; (5) excluding plaintiffs from desirable kitchen jobs which provided the opportunity to earn additional diminution credits; and (6) restricting plaintiffs to incarceration at medium security facilities even when (a) they had lower security classifications

45

which would entitle them access to minimum security facilities and/or (b) they needed programs that were not available at RCI, all in violation of Title II of the ADA and Section 504 of the Rehabilitation Act. For the reasons set forth herein, Summary Judgment is not appropriate on any of these claims.

1. **Plaintiffs do not have a private right of action to challenge the Department's failure to implement policies and procedures required by the ADA's implementing regulations (Claim 1).**

Under their first Claim, Plaintiffs seek Summary Judgment based on the Defendants failure to implement certain policies and procedures, as required by the implementing regulations accompanying Title II of the ADA. Under the regulations, public entities with 50 or more employees, such as the Department of Public Safety & Correctional Services, are required to:

> Designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to it alleging its noncompliance with this part or alleging any actions that would be prohibited by [the ADA]. The public entity shall make available to all interested individuals the name, office address, and telephone number of the employee or employees designated pursuant to this paragraph.

28 C.F.R. § 35.107.

The designated employee is commonly referred to as the "ADA Coordinator."

The regulations also require public entities, "within one year of the effective date of this part, [to] evaluate [their] current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part, and, to the extent modification of any such services policies, and practices is required, the public entity shall proceed to make the necessary modifications." 28 C.F.R. § 35.105(a). Finally, the regulations require the

Department to "make available" to disabled inmates information about the ADA and its "applicability" to the Department "and make such information available to them in such manner as the head of the entity finds necessary to apprise such persons of the protections against discrimination assured them by the Act and this part." 28 C.F.R. § 35.106.

To the extent that Plaintiffs seek to assert a stand-alone claim based purely on the Defendants' undisputed failure to abide by these regulations, this claim must fail. Plaintiffs do not enjoy a private right of action to enforce implementing regulations which impose "an obligation beyond the statutory mandate." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006) (citing *Alexander v. Sandoval*, 532 U.S. 275, 284-85, 121 S. Ct. 1511 (2001). Applying this rule, numerous courts have concluded that there is no private right of action to enforce 28 C.F.R. §§ 35.105, 106, and 107. *See Iverson*, 452 F.3d 94, 101 (1st Cir. 2006) (no private right of action to enforce 28 C.F.R. § 35.105); *O'Byrne v. Reed*, 2010 WL 11596665, at *7 (C.D. Cal. Feb. 5, 2010) (expressing doubts about whether 35.106 establishes a private right of action in light of *Iverson*); *Shaw v. Floyd*, 3:16-CV-2647-D-BK, 2017 WL 2348818, at *3 (N.D. Tex. March 27, 2017) (no private right of action to enforce 28 C.F.R. § 35.107).

In light of the emerging consensus on this issue, this Court holds that Plaintiffs lack a private right of action to hold Defendants liable for failing to implement certain policies and procedures. Instead, the undisputed failure of Defendants to implement policies and procedures designed to inform inmates of their legal rights may be used as evidence that Defendants violated the ADA or the Rehabilitation Act in other ways, such as by failing to provide reasonable modifications. Defendants failure may also be used to calibrate injunctive relief, if appropriate.

## 2. Genuine Disputes of Material Fact Preclude Summary Judgment on Claim 2.

Under Claim 2, Plaintiffs fault Defendants for failing to provide accommodations to ensure that their communications with Defendants, the courts, and others were equally effective as those enjoyed by other inmates. Plaintiffs fault Defendants for failing to make the following forms of "communications," broadly defined, accessible: grievance procedures; the Inmate Handbook and orientation materials; directives and institutional bulletins; requests for medical attention; commissary orders; counseling or therapy materials; the institutional mail system; and library materials, including legal documents and subscription services. (Pls.' Mot. Summ. J. 6-10, ECF No. 172-1.)

Title II prohibits entities from excluding qualified individuals with disabilities from or denying them the benefits of a public entity's "services, programs, or activities." 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). This phrase "encompasses virtually everything that a public entity does." *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 381 (D. Md. 2011) (Hollander, J.) (quoting *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998). Accordingly, state prisons must provide inmates equal access to the benefits they confer, including recreational activities, medical services, and vocational programs. *Yeskey*, 524 U.S. at 210, 118 S. Ct. 1952. The benefits and services must be identified with "some granularity." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016) (narrowly identifying absentee voting, rather than the entire voting program, as the program to which blind voters were entitled equal access). Under this rubric, Plaintiffs may challenge the adequacy of accommodations provided to ensure "equal access" to various minute features of prison life, and they have done so.

Equal access may require "reasonable modifications to rules, policies, or practices, the removal of architectural, communication or transportation barriers, or the provision of auxiliary aids and services." 42 U.S.C. § 12131(2). The term "reasonable modifications" in this context is synonymous with the term "reasonable accommodations" as that term is employed in the context of Title I employment discrimination cases. *Jarboe v. Maryland Dep't of Pub. Safety & Corr. Servs.*, ELH-12-572, 2013 WL 1010357 (D. Md. March 13, 2013). Reasonable modifications include the furnishing of "auxiliary aids or services," which is defined to include the following:

(A) qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments;
(B) qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;
(C) acquisition or modification of equipment or devices; and
(D) other similar services and actions.

42 U.S.C. § 12103(1).

Pursuant to Congressional authorization, *see* 42 U.S.C. § 12134(a), the Justice Department has promulgated implementing regulations which interpret the requirements of Title II. Even if these regulations do not in all cases give rise to stand-alone rights of action, *see supra*, regulations of this kind are nonetheless given "controlling weight." *Seremeth*, 673 F.3d at 338. Under these regulations, public entities are obliged to "ensure that communications with applicants, participants, [and] members of the public . . . with disability are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).

In pursuit of this objective, public entities must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity." § 35.160(b)(1). The

regulations define "auxiliary aids" more broadly than the statute, and include: "qualified readers; taped texts; audio records; Brailled materials and displays; screen reader software; magnification software; optical readers; secondary auditory programs (SAP); large print materials; accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." § 35.104.

Under 28 C.F.R. § 35.160, Defendants must give "primary consideration" to the requests of individuals with disabilities for auxiliary aids and services. The Department of Justice commentary clarifies "that a public entity 'shall honor the choice' of auxiliary aid or service expressed by the person with disabilities, 'unless it can demonstrate that another effective means of communication exists or that use of the means chosen' would fundamentally alter the program, service, or activity of the public entity at issue, or would create an undue financial or administrative burden." *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 397 (D. Md. 2011). To be effective, auxiliary aids and services "must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. *Id.* § 35.160(b)(2).

The type of auxiliary aids required to be provided involves "a fact intensive inquiry often ill-suited for summary judgment." *Reyes v. Dart*, 17 C 9223, 2019 WL 1897096 (N.D. Ill. April 29, 2019) (collecting cases). As the Fourth Circuit has recognized, "what constitutes reasonable accommodations . . . is a question of fact and will vary according to the circumstances." *Seremeth v. Bd. of Cnty. Com'rs Frederick Cnty.*, 673 F.3d 333, 340 (4th Cir. 2012); *see also Crane v. Lifemark Hosps., Inc.,* 898 F.3d 1130, 1135 (11th Cir. 2018) ("The task of

determining whether an entity subject to the RA has provided appropriate auxiliary aids where necessary is inherently fact-intensive and it is precisely because of this fact-intensive inquiry that an effective-communication claim often presents questions of fact precluding summary judgment."). In evaluating this question of fact, the "dispositive question" is not whether the Defendants provided the Plaintiffs with their desired auxiliary aids, "but whether [Defendants'] communication with plaintiff was as effective as [their] communications with others." *Fry v. City of Northglenn, Colorado*, 16-cv-02318-PAB-KLM, 2018 WL 1010942, at *3 (D. Col. Feb. 22, 2018) (collecting cases).

Defendants do not dispute that the overwhelming majority of the "communications" identified by the Plaintiffs were not provided in an accessible format. They instead argue that they have complied with Title II and Section 504 by making available to Plaintiffs "qualified readers or . . . other effective methods of making visually delivered materials available to individuals with visual impairments." 42 U.S.C. § 12103(1)(B). They direct this Court to evidence that Plaintiffs' "walkers," inmates assigned to assist with navigation, and certain staff members routinely read and write for Plaintiffs. *See, e.g.*, PSJ Ex. E, Reid 30(b)(6) Dep. 70:1-17 (testifying that case managers were available to write documents, including ARPs, for blind inmates); DSJ Ex. 10, Job Duties for Inmates Assigned as Escorts for the Blind ("The escort may assist the visually impaired inmate with any written correspondence ([i.e.,] sick call requests, ARP's, departmental requests to staff, etc[.]).")); Brown Dep. 41 ("One of my biggest things from walkers is reading, and I felt that was pretty much a good thing.")

Plaintiffs contend that obtaining assistance from other inmates or staff members is unreasonable as a matter of law because this method of accommodation does not protect their

"privacy and independence," as required by 28 C.F.R. § 35.160(b)(2). However, this interpretation is without merit as it would run afoul of the ADA itself, which specifically permits the services of a "qualified reader" as an accommodation. 42 U.S.C. § 12103(1). The assistance of a third party reader or scribe will always reduce a parties' "independence" to some degree and will likely involve some slight invasion of privacy. Moreover, as Defendants note, prisons never guarantee privacy or independence to any inmates. Whatever guidance the "privacy and independence" requirement offers in other contexts, it cannot be given much weight in prison. *See* 28 C.F.R. § 35.160(b)(2) ("The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used . . . and the context in which the communication is taking place."). Ultimately, the question is not whether Plaintiffs have been deprived of private and independent communications, but whether the services Defendants provide are adequate to ensure that Plaintiffs are able to communicate as effectively as their fellow inmates.

Plaintiffs also fault Defendants for failing to *require*, rather than merely permit, walkers and case managers to assist them with reading and writing. Additionally, they argue that inmate escorts were not "qualified" readers and scribes because they were not screened for certain educational qualifications. These objections, however, are not dispositive. The ultimate question is whether Defendants have taken steps to ensure that blind inmates are able to communicate as effectively as other inmates. In some contexts, the assistance of other inmates may ensure this result. *Wells v. Thaler*, 460 F. App'x 303, 312-13 (5th Cir. 2012) (upholding determination that Defendants satisfied their Title II obligations by permitting inmate to recruit the assistance of other prisoners to access the law library); *Mason v. Corr. Med. Servs.,*

*Inc.*, 559 F.3d 880, 887 (8th Cir. 2009) (holding that plaintiff's assistance from a fellow inmate, who escorted him everywhere and assisted him with all his needs, satisfied the requirements of the ADA).  In this case, the jury must determine whether assistance from other inmates and prison staff satisfied Defendants obligations to blind inmates.  In so doing, the jury must resolve whether, and to what extent, each Plaintiff needed assistance reading and writing; whether inmates or staff were "qualified," that is "able to read effectively, accurately, and impartially using any necessary specialized vocabulary", *see* 28 C.F.R. § 35.104; and, ultimately, whether any assistance received permitted Plaintiffs to communicate "as effectively" as other inmates.

### 3.  Plaintiffs are not entitled to Summary Judgment on Claim 3.

Plaintiffs argue that Defendants denied Hammond, Delano, Wilson, and Brown "equal access to safe housing and violated their rights to reasonable modifications when [they] disregarded their single cell orders and failed to timely respond to Brown's request to be evaluated for a single cell." (ECF No. 172-1, at 42-43.)  To support these assertions, Plaintiffs have supplied evidence that the Department's own medical contractor determined that Delano, Wilson, and Hammond should permanently reside in single cells, but that the Department nonetheless placed them in double-cells.  Additionally, Plaintiffs have produced evidence that on November 24, 2014 Brown was told that he would be double-celled because RCI did not have a record of his visual impairment even though his medical records note a history of "single cell housing [due to] legally blind status."  (PSJ Ex. 60, at BROWN 1022.)

Title II and Section 504 require Defendants to provide safe housing to disabled and non-disabled inmates alike.  *See Spencer v. Earley*, 278 F. App'x 254, 258 n.2, 258-60 (4th Cir.

2008) (permitting Rehabilitation Act claims based in part on allegation that plaintiff was denied "single-cell housing . . . as necessitated by his disability."); *Arenas v. Georgia Dep't of Corrs.*, CV416-320, 2018 WL 988099, at *8 (S.D. Ga. Feb. 20, 2018) (denying defendant's motion to dismiss ADA claim based on failure to provide accommodation of "appropriate cell.") Nevertheless, the reasonableness of a certain celling arrangement, as with all types of requested accommodations, requires a fact-intensive inquiry. *Paulone*, 787 F. Supp. 2d at 398 (D. Md. 2011) ("whether an accommodation is reasonable is ultimately a question of fact"). In this case, the jury must decide whether single-celling was the only reasonable method of ensuring safe housing or if, as some witnesses testified, double-celling was an equally effective means of ensuring safe housing. (Defs.' Resp. Ex. 39, Corcoran Dep. 217 (testifying that "sometimes it can be helpful to have another person in the cell" and that double-celling could be "more safe" [sic] for blind inmates); Defs.' Resp. Ex. 40, Moyer Dep. 70-71 (noting that double-celling blind inmates could ensure their safety during an emergency).)

### 4. Plaintiffs are not entitled to Summary Judgment on Claim 4.

To permit Plaintiffs access to any of their services, Defendants must ensure that Plaintiffs are able to navigate the prison facilities. *See, e.g.*, *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 861 (10th Cir. 2003) ("[F]acilities as a whole must be readily accessible.") It is undisputed that Defendants assign sighted inmates as escorts or "walkers," to help blind inmates navigate prison facilities. Walkers are required to escort blind inmates to any passes (*e.g.,* medical, educational, or other appointments) and assist the blind inmate during an emergency. Although there is evidence that some inmate walkers were uncooperative or aggressive, the jury must ultimately decide whether and to what extent (1) plaintiffs even

needed walkers for assistance navigating; (2) whether plaintiffs were afforded other accommodations, such as canes; and (3) whether each plaintiff received navigation assistance that permitted them "equal access" to Defendants' programs and services. On this record, these issues cannot be resolved on Summary Judgment.

### 5. Plaintiffs are not entitled to Summary Judgment on Claim 5.

Plaintiffs seek Summary Judgment on their claims that they were denied kitchen assignments because of they are blind. Defendants respond that most kitchen work is too dangerous for Plaintiffs, as there is insufficient staff to protect blind inmates from the dangers involved with mixing inmates and cutlery. Defendants also argue that they have satisfied their legal obligations by designating a special kitchen job, the "blind greeter," for blind inmates.

The United States Supreme Court has held that vocational programs are among the benefits and services provided by prisons for purposes of Title II. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210, 118 S. Ct. 1952 (1998). Persuasive authority holds that prisons violate Title II and Section 504 when they exclude prisoners from work because of their disabilities. *See, e.g., Northrop v. Carucci*, No. 3:04–CV–103 RNC, 2007 WL 685173, at *4 (D. Conn. Mar. 5, 2007) (denying summary judgment where the plaintiff alleged "that he was discharged from his kitchen job and not provided a different job because of his disability").

As with any claim of disparate treatment under Title II and Section 504, the Plaintiffs must show that they are "otherwise qualified" to the benefits they seek to enjoy. "An individual is not otherwise qualified if he poses a significant risk to the health and safety of others" because of a disability that cannot be eliminated by reasonable accommodation." *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995). Defendants may

demonstrate, as an affirmative defense, that Plaintiffs posed a "direct threat" to others if permitted to work in the kitchen. *See Wood v. Maryland Dep't of Transp.*, 723 F. App'x 177, 181 (4th Cir. 2018) (explaining that "direct threat" is an affirmative defense to Title II and Section 504 claims). The Department of Justice has promulgated regulations describing how a public entity is to assess whether an individual poses a direct threat:

> In determining whether an individual poses a direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

28 C.F.R. § 35.139(b).

In this case, there is evidence that RCI employees were concerned that Plaintiffs posed a risk to themselves and others when operating in an understaffed prison kitchen. (Defs.' Resp. Ex. 22, Schenck Dep. 131:6-10 (expressing concerns that Hopkins might put hot food on someone's hand or upend a tray while working in close quarters with sixty other inmates). Moreover, there is evidence that Plaintiffs have received adequate accommodations by being able to work in the "blind greeter" position. On this record, it is a question of fact whether plaintiffs were qualified to work in the kitchen and whether the blind greeter position presents a reasonable modification.

### 6. Plaintiffs are not entitled to Summary Judgment on Claim 6.

The Department of Justice regulations proscribe the practice of housing inmates in a discriminatory manner. The regulations state as follows:

(2) Public entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals. Unless it is appropriate to make an exception, a public entity—

(i) Shall not place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available;

. . .

(iii) Shall not place inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed;

28 C.F.R. § 35.152(b)(2)(i), (iii), and (iv).

In this case, there is no dispute that RCI is the Department's designated facility for the blind and that it lacks certain programs and opportunities available at other facilities. Nevertheless, there are factual questions at issue. There is evidence that Hopkins requested to stay at RCI; that Wilson requested to leave Dorsey Run; that James was placed in a minimum security prison; and that Delano could not stay at Patuxent because of safety concerns. The jury must resolve factual disputes concerning whether it was "appropriate" to house inmates in RCI because it offered at least some specialized assistance for blind inmates. The "appropriateness" of this decision must be based upon resolutions of other factual disputes, including the degree to which RCI provided reasonable accommodations to blind inmates.

### 7. Conclusion

In sum, there are numerous factual issues that raise genuine issues of material fact to be addressed at trial. As this Court has recognized, the reasonableness of an accommodation is ordinarily "a fact intensive inquiry." *Nat'l Fed'n of the Blind, Inc. v. Lamone*, RDB-14-1631, 2014 WL 4388342, at *12 (D. Md. Sept. 4, 2014) *aff'd*, 813 F.3d4394 (4th Cir. 2016); *see also Cline v. Contra Costa County*, No. 05-15337, 2006 WL 3698678 (9th Cir. Dec. 13 2006) ("The

reasonableness of an accommodation is ordinarily a jury question."); *Paulone*, 787 F. Supp. 2d

at 398 (D. Md. 2011) ("whether an accommodation is reasonable is ultimately a question of

fact").  On this record, the jury must address a series of factual disputes to determine whether

each Plaintiff received reasonable accommodations affecting nearly every facet of their lives

in prison.

### III.  Summary Judgment is not Warranted on Plaintiffs' Claims for Injunctive Relief.

Finally, Defendants have moved for Summary Judgment on Plaintiffs' claims for

injunctive relief under all Claims.

"Under 'well-established principles of equity,' a plaintiff seeking a permanent

injunction must demonstrate:

(1) that [he] has suffered an irreparable injury;
(2) that remedies available at law, such as monetary damages, are inadequate to
compensate for that injury;
(3) that, considering the balance of hardships between the plaintiff and
defendant, a remedy in equity is warranted; and
(4) that the public interest would not be disserved by a permanent injunction.

*Legend Night Club v. Miller*, 637 F.3d 291, 297 (4th Cir. 2011) (quoting *eBay Inc. v.
MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

As a prelminary matter, Plaintiffs Polley, Hammond, Delano, Hopkins, and Holley

have no claim to equitable relief because they are no longer incarcerated.  *See Rendelman v. Rouse*,

569 F.3d 182, 186 (4th Cir. 2009) ("[A]s a general rule, a prisoner's transfer or release from a

particular prison moots his claims for injunctive and declaratory relief with respect to his

incarceration there.")

In light of this Court's ruling in favor of Defendants on Plaintiffs' constitutional claims (Counts I and II), injunctive relief based on any alleged constitutional violations is not warranted. As to Counts III and IV, genuine disputes of material fact preclude Summary Judgment on Plaintiffs' claims for injunctive relief. There is evidence that conditions at RCI have changed very little since this litigation commenced. Accordingly, there are genuine issues of material fact with respect to the ADA and Rehabilitation Act, which preclude Summary Judgment on those claims.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss (ECF No. 100) is DENIED AS MOOT; Plaintiffs' Motion for Partial Summary Judgment (ECF No. 172) is DENIED; Defendants' Motion for Summary Judgment (ECF No. 178) is GRANTED IN PART AND DENIED IN PART; Plaintiffs' Motion for Leave to File a Surreply (ECF No. 207) is GRANTED; and Plaintiffs' Motion for Substitution or for Judicial Notice of Substitution under Federal Rule of Civil Procedure 25(d) (ECF No. 208) is GRANTED. Summary Judgment IS ENTERED in favor of Defendants on Counts I and II. Counts III and IV will proceed to trial against the Department and Green in his official capacity.


A separate Order follows.


Dated: May 13, 2019


          /s/

Richard D. Bennett
United States District Judge